**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

GILDA YAZZIE,

       *Plaintiff*,

   v.

NATIONAL ORGANIZATION FOR
WOMEN *et al.*,

       *Defendants.*

Civil Action No. 19-3845 (RDM)

## MEMORANDUM OPINION AND ORDER

In 2017, Defendant National Organization for Women ("NOW") held an election to choose the organization's next President and Vice President.  Defendant Toni Van Pelt ran for President, with Plaintiff Gilda Yazzie as her running mate.  The pair won the election and began what was supposed to be a four-year term in office.  Yazzie alleges that as soon as they assumed their new positions, however, Van Pelt told NOW staff members that she had run with Yazzie only because Van Pelt thought she needed a woman of color on her ticket to win.  Van Pelt then allegedly took steps to exclude Yazzie from management of the organization, initially by preventing her from participating in the budget process or signing checks, and eventually by locking Yazzie out of the office and her email account.  In January 2018, Van Pelt allegedly assaulted Yazzie, and, after Yazzie complained to the staff and Board of Directors about the abusive work environment at the NOW headquarters, Van Pelt allegedly retaliated by forcing Yazzie to take a leave of absence.  Yazzie and her supporters at NOW repeatedly urged the Board to investigate Van Pelt and the allegedly hostile work environment she had created for

Yazzie and other employees of color, while Van Pelt asked the Board to terminate Yazzie.  Amid accusations from Defendants Beth Corbin and Cynthia Drabek that Yazzie had stolen money from NOW, the Board of Directors terminated her in May 2019, less than two years into her four-year term.

In this action, Yazzie brings claims against NOW for employment discrimination; against NOW and Van Pelt for assault and battery; and against NOW, Van Pelt, Corbin, and Drabek for defamation.  Defendants have moved to dismiss the case.  Dkt. 8.  For the reasons that follow, the Court will **GRANT** the motion with respect to the assault and battery claims but will **DENY** the motion in all other respects.

## I.  BACKGROUND

### A.      Factual Background

The following factual allegations are drawn from the complaint, as well as documents incorporated in Yazzie's pleadings by reference, or are subject to judicial notice.  For purposes of Defendants' motions to dismiss, the Court accepts Yazzie's factual allegations as true.  *See Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007).

Founded in 1966 and headquartered in the District of Columbia, NOW "is the largest organization of feminist grassroots activists in the United States," with hundreds of chapters and thousands of members in all fifty states and D.C.  *See* About NOW, https://now.org/about (last visited Mar. 29, 2021).  The organization aims "to promote feminist ideals, lead societal change, eliminate discrimination, and achieve and protect the equal rights of all women and girls in all aspects of social, political, and economic life."  *Id.*

In 2017, Yazzie, who is Native American, Dkt. 1-3 at 2 (Compl. ¶ 6), ran for Vice President of NOW, as the running mate of Defendant Van Pelt, *id.* at 3 (Compl. ¶ 13).  In her bid

for the presidency of NOW, Van Pelt utilized campaign materials that touted Yazzie as "100% Navajo," allegedly without Yazzie's consent. *Id.* (Compl ¶ 14).  Although she identifies as Diné American, Yazzie took offense to being "identified by quantum." *Id.* at 3–4 (Compl. ¶ 14).  At the 2017 NOW Annual Conference, Van Pelt was elected President and Yazzie was elected Vice President. *Id.* at 3 (Compl. ¶ 13).  Both were slated to serve four-year terms. *Id.* Yazzie alleges that, once the pair took office, Van Pelt immediately took steps to exclude Yazzie from the management of the organization, eventually leading to Yazzie's termination, and that Van Pelt subjected other employees of color to similar mistreatment.

The NOW bylaws provide that the President serves as Chief Executive Officer and Chief Financial Officer of the organization, while the Vice President serves as Treasurer and "is responsible for managing human resources, staff, chapter and member relations[,] and administration." *Id.* at 4 (Compl. ¶ 15).  The President produces monthly financial reports, which are then provided to the Vice President, who reviews them with the President and then presents the reports to the NOW Executive Board. *Id.* (Compl. ¶ 16).  As for the organization's annual budget, the President and the Vice President had worked together in prior administrations to develop the budget proposal, before presenting it to the Budget Committee and then finally to the full national Board of Directors for their vote. *Id.* at 5 (Compl. ¶ 22).  With respect to individual expenses, "[u]nder prior NOW operating procedures, both the President and Vice President [were] required to cosign all checks above $5,000." *Id.* at 6 (Compl. ¶ 24).

At least, that's how Yazzie says things were supposed to work.  She alleges that, upon taking office, Van Pelt "refused to collaborate directly with [her], to meet individually with her[,] and would rarely communicate directly with [her]." *Id.* at 4 (Compl. ¶ 19).  Before becoming Vice President, Yazzie already had expertise in the organization's budget process, having served

on the Budget Committee of NOW's Board for more than 10 years. *Id.* (Compl. ¶ 17). But "Van Pelt unilaterally removed Yazzie from the budget review process, notwithstanding Yazzie's position as Vice President and Treasurer and notwithstanding . . . [Yazzie]'s familiarity with the process." *Id.* at 5 (Compl. ¶ 22). Van Pelt also excluded Yazzie from the process for approving expenses. "Van Pelt ordered that a signature stamp for Yazzie's signature be bought" and directed a NOW employee to deliver the stamp to Van Pelt's home in Florida. *Id.* at 6 (Compl. ¶ 24). When the employee instead had the stamp delivered to the NOW headquarters in the District of Columbia, "Van Pelt obtained [Yazzie's] signature stamp and kept it locked in her office." *Id.* Later, Van Pelt had the bank "remove [Yazzie's] name as a cosigner" and replaced her "with a lower ranking staffer." *Id.* Likewise, Van Pelt never permitted Yazzie access to NOW's financial software, and Van Pelt "refused to provide monthly financial accountings or budget proposal[s] to Yazzie," despite Yazzie's duty as Treasurer to report on the finances of NOW to the Board. *Id.* at 8 (Compl. ¶ 29).

While Van Pelt was allegedly isolating and excluding Yazzie, she also made comments about Yazzie to other members of the NOW staff. In August 2017, Van Pelt "repeatedly" told two NOW staff members, Tyler Goodridge and Rachel Motley, "that the only reason she chose Yazzie as her running mate for the Vice President position was because the campaign needed 'a woman of color' to get elected." *Id.* at 5 (Compl. ¶ 20). In other conversations, including with Motley and staff member Emily Imhoff, Van Pelt "repeatedly referred to Yazzie as 'weird.'" *Id.* at 4 (Compl. ¶ 18).

Yazzie alleges that Van Pelt mistreated other staff members of color. Rui Mulligan, who is Asian-American, had managed NOW's social media fundraising efforts since 2015, "substantially increasing funds raised for the organization during her tenure." *Id.* at 6

(Compl. ¶ 23).  On October 2, 2017, without first speaking to Mulligan about the decision, "Van Pelt unilaterally removed Mulligan from all of NOW's social media accounts and changed all her passwords."  *Id.*  Mulligan requested a private meeting with Van Pelt to discuss the change in responsibilities, but instead of granting that request, Van Pelt stated publicly, in front of Mulligan's co-workers, that Mulligan's "best was simply not good enough."  *Id.*

Following the resignation of network administrator Paul Wommack in December 2017, Van Pelt directed senior accounting executive Sparkle Barrett, who is African-American, to withhold Wommack's final paycheck, which included two weeks' pay plus compensation for unused vacation time.  *Id.* at 6–7 (Compl. ¶¶ 25–26).  Barrett "expressed reluctance," and Van Pelt then "shouted and stood hovering less than a foot away from Barrett's desk."  *Id.* at 7 (Compl. ¶ 25).  Yazzie and an auditing consultant both admonished Van Pelt to pay Wommack the money he was owed.  *Id.* (Compl. ¶ 26).  Barrett then issued the final paycheck to Wommack.  *Id.*  This "[a]ngered" Van Pelt, who "shouted" at Barrett, "threaten[ing] to fire Barrett and to pursue legal action against her for the 'wrongful act' of paying" Wommack.  *Id.*

Yazzie alleges that the situation worsened in 2018.  On Monday, January 15, 2018, NOW staff members planned to work on the National Mall doing "organizational standard social media field work and feminist organizing" as part of Martin Luther King Day events.  *Id.* at 8 (Compl. ¶ 30).  But Van Pelt required the staff to work in the office, neither permitting them to participate in events commemorating the holiday nor allowing them to take the federal holiday off work.  *Id.*  Despite Van Pelt's stance, Yazzie, in her role as Vice President, attended a rally in honor of the holiday.

Two weeks later, on January 29, 2018, at approximately 11:20 a.m., Van Pelt confronted Yazzie.  *Id.* (Compl. ¶ 31).  Yazzie alleges that Van Pelt yelled, "You won't be here for three

years!" and "I am the [P]resident, so you have to do what I say." *Id.*  Yazzie attempted to retreat

to her office, but "Van Pelt followed Yazzie into her office, screamed at her, threw papers at her,

bumped her (i.e., body slammed Yazzie)[,] and cornered [her]." *Id.*  Feeling intimidated, Yazzie

then moved past Van Pelt and "escape[d]" to the office of staff member Linda Berg. *Id.* at 8–9.

Yazzie, escorted by Berg, then returned to her own office and, "quickly and in great

distress, prepared a memorandum [that] she distributed to fellow staff and interns describing Van

Pelt's behavior." *Id.* at 9 (Compl. ¶¶ 31–32).  In the memorandum, Yazzie wrote that "[i]t's

scary at the National Action Center [("NAC")]" and that "[o]f most concern is that [Van Pelt] is

patronizing to the people of color staff." *Id.* (Compl. ¶ 32).  Yazzie also sent an additional text

message to the staff, telling them that "Toni Van Pelt has created a hostile work-place for me"

and explaining that she had been "physically threaten[ed] in a demeaning situation created by

Toni Van Pelt." *Id.* (Compl. ¶ 33) (alternation in original).  Yazzie alerted the staff that she

would "be working remotely." *Id.*  Van Pelt responded the same day, directing Yazzie not to

make announcements to staff "concerning the business of NOW and/or [their] personal

relationship." *Id.* (Compl. ¶ 34).  Van Pelt stated that she is responsible for "determin[ing]

[Yazzie's] job duties and [would] soon provide to [Yazzie her] job description." *Id.*  She closed

by saying that she "expect[ed] to see [Yazzie] at the office tomorrow behaving in a calm, rational

manner." *Id.*

On February 5, 2018, Yazzie informed the NOW Advisory Committee of Van Pelt's

conduct, "specifically the verbal abuse of her by Van Pelt and physical stalking of [Yazzie] by

Van Pelt, all of which escalated into intimidation and battery." *Id.* at 9–10 (Compl. ¶ 35).  In her

communication with the committee, Yazzie explained that she had been working remotely to

"avoid" Van Pelt and requested "assistance" communicating with Van Pelt to "aid in providing a safe workplace and [Yazzie's] wellbeing." *Id.* at 10.

At some point thereafter, "Van Pelt prohibited most staff members from having any communication directly with Yazzie." *Id.* at 11 (Compl. ¶ 40).  In May 2018, Van Pelt promoted Lisa Seigel[1] from the position of part-time archivist to chief of staff.  *Id.* at 12 (Compl. ¶ 41). Seigel was assigned several tasks, including onboarding new employees and overseeing NOW chapters, that were supposed to be responsibilities of the Vice President under the organization's bylaws and past practice.  *Id.*  Van Pelt continued to use Yazzie's name on NOW communications without permitting Yazzie to review those communications, including a press release referring to the Washington Redskins without any mention of the "widely recognized dispute over the implied racism and Native American community outrage over the term." *Id.* at 11–12 (Compl. ¶ 40).

Around the same time, other employees of color continued to experience issues at NOW. Staff member Chioke Barkari, who is African-American, resigned in March 2018.  *Id.* at 10 (Compl. ¶¶ 36–37).  As she had done when Wommack resigned, Van Pelt once again opposed paying Barkari for a portion of her accrued vacation time.  *Id.* (Compl. ¶ 36).  Barrett, who is also African-American, "defied Van Pelt" and paid Barkari for her vacation time.  *Id.*  In April 2018, Van Pelt "summarily discharged" Barrett.  *Id.* at 11 (Compl. ¶ 39).  In May 2018, after a second "de facto demotion" to "IT person," Mulligan, who is Asian-American, quit.  *Id.* at 12

---

[1]  As Defendants point out, Yazzie misspells Seigel's name in the complaint.  Given that the spelling of Seigel's name is not material to resolving the pending motion, the Court sees no harm in spelling her name correctly in this opinion, while still accepting all of Yazzie's factual allegations as true.

(Compl. ¶ 43).  In a telephone conversation, Van Pelt told Mulligan, "I don't care about anything you have to say.  I only care about you doing exactly what I tell you to do immediately." *Id.*

On May 21, 2018, Van Pelt gave Yazzie an ultimatum: she could either resign or take "personal time" leave. *Id.* at 13 (Compl. ¶ 44).  Yazzie agreed to take leave and was then barred from the NOW office, with the locks changed on Van Pelt's orders, and denied access to her NOW email, "notwithstanding the fact that she was the duly elected Vice President of the organization." *Id.*  Yazzie's name was then signed to an email (which she alleges she had no part in drafting and did not review prior to its dissemination) stating that "henceforth Yazzie would be out of the office." *Id.*  When confronted by an Executive Board member about Yazzie being denied access to her email account, Van Pelt claimed that Yazzie's email had been "hacked" and that there were "technical problems." *Id.*  After Yazzie began her leave, "[s]everal staff members complained to the Board of Directors in writing," attaching "an extensive folder of files, texts[,] and emails substantiating their claims to have witnessed Van Pelt's disrespectful and intimidating treatment of staff members of color as well as non[-]gender-normative staff." *Id.* (Compl. ¶ 45).  Among the staff members' grievances was "the physically intimidating and aggressive treatment of Yazzie and other women of color by Van Pelt." *Id.*

At a meeting of the NOW Board of Directors in June 2018, Van Pelt sought Yazzie's removal, in part by allegedly "scapegoating" Yazzie for not producing regular financial reports. *Id.* at 13–14 (Compl. ¶ 46).  According to Yazzie, the Board "debunked" the allegation by ascertaining that producing budget reports was actually Van Pelt's responsibility, in her role as Chief Financial Officer. *Id.* at 14.  The Board also considered a letter from Wommack stating that "he both witnessed Van Pelt's abusive behavior toward[] Yazzie and that he was specifically forbidden by Van Pelt from allowing Yazzie access to NOW's financial software during his

entire tenure." *Id.* To defend against Van Pelt's allegations, "Yazzie and her supporters complained that Van Pelt's behaviors created a hostile work environment for Yazzie and that there was discrimination against women of color within the NOW [h]eadquarters." *Id.* In the end, the Board declined to remove Yazzie but also declined to open an investigation into the allegations of racial discrimination by Van Pelt. *Id.* at 14–15.

Around the same time, another woman of color began working at NOW and also ran into trouble with Van Pelt. Brittany Oliver, who is African-American, applied to become NOW's communications director, a job for which Yazzie alleges Oliver was well-qualified. *Id.* at 15 (Compl. ¶ 47). Van Pelt offered Oliver a job, but not the director-level position for which she had applied. *Id.* Instead, Van Pelt offered Oliver the newly created position of assistant director of communications and advocacy, "at a much lower salary." *Id.* But Van Pelt did not fill the communications director position, and Oliver ended up performing the duties of the communications director, only without the title or pay commensurate with that position. *Id.*

In July 2018, NOW membership and development specialist Vicki Linton wrote a letter to the Board announcing her resignation and stating that she had witnessed racial discrimination and hostility in the workplace. *Id.* (Compl. ¶ 49). She "admonished" the Board for not acting on prior complaints about a hostile workplace. *Id.* at 15–16. As for Yazzie, Linton wrote:

> I found the treatment of Gilda Yazzie deeply troubling additionally because I repeatedly heard [Van Pelt] state that she only chose [Yazzie] as her vice presidential candidate because "They said I had to have a woman of color." [Yazzie] is well known as a longtime NOW activist and member of the [B]oard with significant experience with NOW's budget. It was disturbing to see [Yazzie] casually treated as a token woman of color chosen to enhance the intersectional credibility of a white woman.

*Id.* at 16.

Also in July 2018, Van Pelt accused Yazzie at a Board of Directors meeting "of being a person of poor moral standards who should be removed from office." *Id.* (Compl. ¶ 50). Given

the conflict between Van Pelt and Yazzie, the Board decided to give Yazzie a separate budget and to permit her to work in the field, "to avoid personal interactions with Van Pelt." *Id.* The Board also appointed a "Vice-Presidential Oversight Committee," which Yazzie alleges had a "stated purpose" of "protect[ing] Yazzie from Van Pelt." *Id.*

Yazzie alleges that, as time went on, Van Pelt became hostile to efforts by Yazzie and Oliver to involve NOW in activism related to racial justice.  In August 2018, Oliver proposed that NOW should issue a public statement in response to a white supremacist rally. *Id.* at 17 (Compl. ¶ 52).  Van Pelt responded to Oliver that "Black people can be racist too." *Id.*  Two months later, on October 9, 2018, Van Pelt and Seigel gave Oliver "a 90[-]day review." *Id.* (Compl. ¶ 53).  Van Pelt expressed concern that Oliver was "more concerned about Black women than all women." *Id.*  Shortly thereafter, Oliver was supposed to give a presentation to the NOW Board, but a scheduling conflict arose, and she had to leave the meeting early for a responsibility related to her leadership role in the National March for Black Women. *Id.* at 17– 18 (Compl. ¶ 54).  Oliver asked Yazzie to make the presentation in her place, but Van Pelt "refused to allow Yazzie to do so." *Id.* at 18.  On October 17, 2018, Van Pelt fired Oliver. *Id.*

On October 27, 2018, two members of the Vice-Presidential Oversight Committee, "acting upon Van Pelt's instructions, told Yazzie that her work was excessively focused on issues of concern to Native American [w]omen." *Id.* (Compl. ¶ 55).  They told Yazzie that her focus was "great but not inclusive." *Id.*  Two months later, on December 27, 2018, Defendant Beth Corbin, who was a member of the Board of Directors and had been Van Pelt's campaign manager, sent an email to Yazzie "and the entire NOW [B]oard of [D]irectors" stating that "[t]he reason [Yazzie was] not working at the National Action Center was not to protect [her] from [Van Pelt], but to protect the organization from [Yazzie].  We cannot have someone in our NAC

that was embezzling money from our organization, and actively working to turn staff against the President." *Id.* at 19 (Compl. ¶ 57).

On January 2, 2019, Van Pelt announced in a staff meeting that Yazzie would cease publicly representing NOW in its advocacy related to the Equal Rights Amendment and that Yazzie would have to back out of an upcoming panel discussion at the United Nations. *Id.* (Compl. ¶ 58). On January 16, 2019, Yazzie "was placed on medical leave due to the stress caused by the harassment by Van Pelt" and her associates. *Id.* at 20 (Compl. ¶ 59). On January 25, 2019, the Board held a meeting at which, according to Yazzie, it was supposed to address Oliver's complaints about racial discrimination. *Id.* (Compl. ¶ 61). But the meeting was allegedly "hijacked by Van Pelt and her allies, [who were] solely focused on alleged deficiencies in Yazzie's performance, relying upon the allegations" about Yazzie's purported financial mismanagement that had been repudiated at prior meetings. *Id.* In addition, Defendant Cindy Drabek accused Yazzie of "illegally us[ing] the NOW credit card." *Id.*

On May 6, 2019, at "the direction of Van Pelt, Yazzie was removed from office" as NOW's Vice President. *Id.* at 21 (Compl. ¶ 62). The next day, NOW issued a statement that "Yazzie is no longer the NOW [V]ice [P]resident by removal from office by the national [B]oard and in accordance with NOW's bylaws." *Id.*

**B.      Procedural Background**

Yazzie originally filed this lawsuit against NOW, Van Pelt, Drabek, and Corbin in D.C. Superior Court on October 27, 2019. Dkt. 1-3 at 1. Her complaint includes nine counts: claims for race discrimination, hostile work environment, and retaliation against NOW under Title VII of the Civil Rights Act of 1964, *id.* at 21–26 (Compl. ¶¶ 63–89); three similar claims against NOW under 42 U.S.C. § 1981, *id.* at 26–32 (Compl. ¶¶ 90–116); state-law claims for assault and

battery against NOW and Van Pelt, *id.* at 32–35 (Compl. ¶¶ 117–128); and, finally, a state-law claim for defamation against all Defendants, *id.* at 35–37 (Compl. ¶¶ 129–136).  On December 30, 2019, NOW removed the case to this Court, invoking the Court's federal question jurisdiction.  Dkt. 1 at 2.  On January 7, 2020, Defendants moved to dismiss.  Dkt. 8.

That same day, the Court directed Yazzie either to have her counsel enter a notice of appearance or to notify the Court that she intended to proceed pro se.  Minute Order (Jan. 7, 2020).  Yazzie's counsel then sent a letter to the Court requesting more time to enter a notice of appearance, Dkt. 9, which the Court granted, Minute Order (Jan. 27, 2020).  Yazzie's counsel then attempted to file a motion for admission pro hac vice, but the Clerk's office rejected the motion because of filing errors.  Counsel failed to make any further attempt to appear in the case. The Court thus issued a *Fox*/*Neal* Order on March 4, 2020 directing Plaintiff to respond to the motion to dismiss on or before March 27, 2020.  Dkt. 12.  Yazzie did not file any response.  On June 3, 2020, the Court extended the period for Yazzie to respond until June 21, 2020.  Minute Order (June 3, 2020).  On June 15, 2020, new counsel for Yazzie filed a motion for leave to appear pro hac vice, Dkt. 13, which the Court granted, Minute Order (June 19, 2020).  Yazzie responded to the motion to dismiss on June 23, 2020.  Dkt. 15.  Defendants replied on June 30, 2020.  Dkt. 16.  The motion to dismiss is now ripe for decision.

## II.  LEGAL STANDARD

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal sufficiency of a complaint."  *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  In evaluating a Rule 12(b)(6) motion, the Court "must first 'tak[e] note of the elements a plaintiff must plead to state [the] claim' to relief, and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its

face.'" *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)) (alterations in original) (internal citation omitted).  The complaint, however, need not include "detailed factual allegations" to withstand a Rule 12(b)(6) motion.  *Twombly*, 550 U.S. at 555.  A plaintiff may survive a Rule 12(b)(6) motion even if "recovery is very remote and unlikely," so long as the facts alleged in the complaint are "enough to raise a right to relief above the speculative level."  *Id.* at 555–56.  In assessing a Rule 12(b)(6) motion, a court may consider only "the facts contained within the four corners of the complaint," *Nat'l Postal Prof'l Nurses v. U.S. Postal Serv.*, 461 F. Supp. 2d 24, 28 (D.D.C. 2006), along with "any documents attached to or incorporated into the complaint, matters of which the court may take judicial notice, and matters of public record," *United States ex rel. Head v. Kane Co.*, 798 F. Supp. 2d 186, 193 (D.D.C. 2011).

## III.  ANALYSIS

### A.     Counts I, II, and III: Title VII Claims

Defendants move to dismiss Yazzie's Title VII claims, which she brings against NOW alone, on the ground that NOW does not qualify as an "employer" within the meaning of the statute.  Dkt. 8-1 at 4–5.  Title VII defines an "employer" as "a person engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding calendar year."  42 U.S.C.§ 2000e(b).  To determine whether an employer "has" an employee for a given "working day," the Supreme Court has endorsed a test known as the "payroll method," which takes its name from the fact that "the employment relationship is most readily demonstrated by the individual's appearance on the employer's payroll."  *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 206 (1997).

Under the payroll method, as explained by the Supreme Court in *Walters*, an employer "has" an employee for any day on which an employment relationship exists, regardless of whether the employee works or receives compensation on that day, such that both salaried and part-time employees fall within the statute's coverage during their periods of employment. *Id.* at 207–11. The Supreme Court adopted this approach in part for its simplicity. As opposed to an approach that would require a court to ascertain exactly who had come to work each day of the year, under the payroll method "all one needs to know about a given employee for a given year is whether the employee started or ended employment during that year and, if so, when." *Id.* at 211. That worker "is counted as an employee for each working day after arrival and before departure." *Id.* Because the focus is on an employment relationship, however, "an individual who appears on the payroll but is not an 'employee' under traditional principles of agency law . . . would not count toward the 15-employee minimum." *Id.* (internal citation omitted).

As Yazzie correctly points out, the question of whether an employer had the statutory minimum number of employees during the relevant time period is not generally amenable to resolution at the motion to dismiss stage. Dkt. 15 at 21. As explained above, in resolving a motion to dismiss under Rule 12(b)(6), a Court may consider only "the facts contained within the four corners of the complaint," *Nat'l Postal Prof'l Nurses*, 461 F. Supp. 2d at 28, along with "any documents attached to or incorporated into the complaint, matters of which the court may take judicial notice, and matters of public record," *Kane Co.*, 798 F. Supp. 2d at 193. But the payroll method, as its name suggests, requires a close inspection of the employer's payroll records, as well as a fact-bound inquiry into whether a given worker qualifies as an employee or an independent contractor under traditional principles of agency law. Yazzie did not attach or

14

incorporate NOW's payroll records in her complaint (nor are they subject to judicial notice or matters of public record), and they are thus not fit for consideration on a motion to dismiss.

In reply, Defendants contend that the Court could still resolve whether NOW is a covered employer under Title VII at this juncture by construing their motion to dismiss as one for summary judgment.  Dkt. 16 at 4.  Under Rule 12(d), if "matters outside the pleadings are presented to and not excluded by the court," then the Rule 12 "motion must be treated as one for summary judgment under Rule 56."  Fed. R. Civ. P. 12(d).  The Court thus has discretion to either exclude the extraneous material or to treat the motion as one for summary judgment.  *See Bowe-Connor v. Shinseki*, 845 F. Supp. 2d 77, 85 (D.D.C. 2012) ("The decision to convert a motion to dismiss into a motion for summary judgment is committed to the sound discretion of the trial court." (internal quotation marks, alteration, and citation omitted)).

Here, the Court declines to construe Defendants' motion as one for summary judgment. In exercising its discretion, the Court "must assure itself that summary judgment treatment would be fair to both parties," *Bowe-Connor*, 845 F. Supp. 2d at 85–86, and the Court must also ensure that "[a]ll parties . . . be given a reasonable opportunity to present all the material that is pertinent to the motion," Fed. R. Civ. P. 12(d).  Here Yazzie has not yet been afforded an opportunity to take discovery that might bear on the question of whether NOW had at least fifteen employees during Yazzie's tenure as Vice President, and, accordingly, treating the motion as one for summary judgment would unfairly prejudice her.

But even if the Court were to construe Defendants' motion as one for summary judgment, they have not carried their burden of "show[ing] that there is no genuine dispute as to any material fact."  Fed. R. Civ. P. 56(a).  In support of their motion, Defendants attached a declaration from NOW chief of staff Lisa Seigel.  Dkt. 8-2 at 2 (Seigel Decl. ¶ 1).  The

declaration includes a rudimentary chart that lists the number of employees that NOW had for each payroll period from December 25, 2017 to May 10, 2019.  *Id.* at 3.  The chart, which essentially presents a legal conclusion in numerical form, does not supply any of the information that the Court needs to apply the payroll method.  For instance, the Court cannot discern from the chart the names of any NOW employees, much less "whether th[ose] employee[s] started or ended employment during [the relevant] year[s] and, if so, when."  *Walters*, 519 U.S. at 211. Yazzie responded with a declaration of her own, which lists the names of more than twenty people whom she claims were NOW employees during her tenure, but she explains that she "d[id] not have access to payroll records that would identify the specific individuals who were employed, when they worked[,] and what their duties/roles were."  *See* Dkt. 15-1 at 2–3 (Yazzie Decl. ¶¶ 8–11).

With their reply brief, Defendants submitted an additional declaration from Seigel.  Dkt. 16-1 (2d Seigel Decl. ¶ 4).  This time, Seigel attached to her declaration a chart that more closely approximates a payroll record, listing each employee's name, identification number, most recent hire date, and termination date, as applicable.  *Id.* at 5–6.  But, once again, this chart does not permit the Court to conclude, beyond reasonable dispute, that NOW had fifteen employees during any given week.  Inexplicably, the chart lists only the "most recent" hire date, leaving open at least the possibility that an employee whom the chart lists as a recent hire also in fact worked for NOW during some earlier period.  And, more importantly, because this evidence was proffered only in reply, it comes too late to support Defendants' motion.  *See Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) ("Issues may not be raised for the first time in a reply brief." (quotation marks and citation omitted)).  The Court, accordingly, concludes that a dispute of material fact remains in this case as to whether NOW "ha[d] fifteen or more

employees for each working day in each of twenty or more calendar weeks in" years when Yazzie alleges the discrimination occurred.  42 U.S.C.§ 2000e(b).

Although Defendants move to dismiss Yazzie's essentially identical claims under 42 U.S.C. § 1981 on the merits, they rely solely on their argument about whether NOW was a covered employer in seeking dismissal of her Title VII claims.  In a footnote in their reply brief, however, Defendants contend that "[e]ven if the Court finds that NOW is a covered employer, Plaintiff's Title VII claims should be dismissed for the reasons set forth with respect to Plaintiff's Section 1981 claims."  Dkt. 16 at 6 n.1.  Again, Defendants have forfeited this argument by not raising it in their opening brief, and the Court need not consider it.  *See Kennedy-Jarvis v. Wells*, 195 F. Supp. 3d 230, 237 n.4 (D.D.C. 2016) (referencing "the D.C. Circuit's admonitions that the [C]ourt need not address an argument raised for the first time in a reply brief") (citing *McBride v. Merrell Dow & Pharm., Inc.*, 800 F.2d 1208, 1211 (D.C. Cir. 1986)).  But, in any event, as explained below, the Court concludes that Yazzie has plausibly stated a claim on the merits under 42 U.S.C. § 1981, and the Court would therefore reach the same conclusion with respect to her Title VII claims.

Defendants' motion to dismiss Yazzie's Title VII claims will therefore be denied.

**B.**     **Counts IV, V, and VI: 42 U.S.C.§ 1981 Claims**

Unlike with respect to Yazzie's claims under Title VII, Defendants move to dismiss her claims against NOW under 42 U.S.C. § 1981 on the merits.  That statute provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981.

Yazzie asserts § 1981 claims against NOW for race discrimination, hostile work environment, and retaliation.  "In Section 1981 and Title VII cases, courts use the same framework for determining whether unlawful discrimination has occurred."  *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013).  Indeed, the tests for evaluating all three types of claims under § 1981 are the same as under Title VII.  *See id.* at 576–78; *Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014); *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004).

To prevail on a § 1981 disparate treatment in employment claim, as on a Title VII racial discrimination claim, the plaintiff must show that "the employer intentionally discriminated against the employee on the basis of race."  *Ayissi-Etoh*, 712 F.3d at 576.  In the absence of direct evidence of discrimination, a plaintiff may "state a prima facie claim of discrimination" under the burden-shifting framework announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), "by establishing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."  *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002) (internal quotation marks and citation omitted); *see also Brown*, 774 F.3d at 1022 ("To evaluate a section 1981 claim, courts use the three-step *McDonnell Douglas* framework for establishing racial discrimination under Title VII." (internal quotation marks and citation omitted)).  The Supreme Court has instructed, however, that "the precise requirements of a prima facie case can vary depending on the context" and "should not be transposed into a rigid pleading standard for discrimination cases."  *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512 (2002).  As such, the

D.C. Circuit has adapted the elements of the prima facie case for retaliation and hostile work environment claims, as discussed in detail below.[2]

In expounding on the *McDonnell Douglas* framework, the Supreme Court has explained that "an employment discrimination plaintiff need not plead a prima facie case of discrimination." *Swierkiewicz*, 534 U.S. at 515. Based on that precedent, some judges in this district have observed that "a plaintiff need not plead all elements of a prima facie case . . . to survive a Rule 12(b)(6) motion." *Bryant v. Pepco*, 730 F. Supp. 2d 25, 29 (D.D.C. 2010); *Vance v. Chao*, 496 F. Supp. 2d 182, 186–87 (D.D.C. 2007). Other judges in this district have expressed some skepticism about whether this proposition drawn from *Swierkiewicz* is consistent with the pleading standard set forth in the Supreme Court's later decision in *Iqbal*, *see Menoken v. McGettigan*, 273 F. Supp. 3d 188, 201 (D.D.C. 2017), given that *Iqbal* requires the Court to "'tak[e] note of the elements a plaintiff must plead to state [the] claim' to relief, and then determine whether the plaintiff has pleaded those elements with adequate factual support to 'state a claim to relief that is plausible on its face,'" *Blue*, 811 F.3d at 20 (quoting *Iqbal*, 556 U.S. at 675, 678) (alteration in original) (internal citation omitted). Notably, the D.C. Circuit

---

[2] Several courts of appeals have held that the *McDonnell Douglas* burden-shifting framework, including the prima facie case, applies to hostile work environment claims. *See, e.g.*, *Clay v. United Parcel Serv., Inc.*, 501 F.3d 695, 706 (6th Cir. 2007) (holding that "[t]he *McDonnell Douglas* burden-shifting approach also applies to hostile-work-environment claims"); *Erenberg v. Methodist Hosp.*, 357 F.3d 787, 792 (8th Cir. 2004) (same); *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1221–22 (10th Cir. 2015) (same). The D.C. Circuit has not been quite as explicit in answering this question, but it has at least hinted that the *McDonnell Douglas* framework applies to hostile work environment claims, as recognized by other judges in this district. *See Hendricks v. Paulson*, 520 F. Supp. 2d 65, 89 (D.D.C. 2007), *aff'd sub nom. Hendricks v. Geithner*, 568 F.3d 1008 (D.C. Cir. 2009) (citing *Duren v. Wash. Metro. Area Transit Auth.*, 2004 WL 2857273, at *1 (D.C. Cir. 2004) (per curiam) and *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002)) ("[T]he law of this Circuit provides for the application of the *McDonnell Douglas* framework to hostile work environment claims."); *see also Kilby-Robb v. Spellings*, 522 F. Supp. 2d 148, 162–63 (D.D.C. 2007), *aff'd*, 309 F. App'x 422 (D.C. Cir. 2009); *Baloch v. Norton*, 355 F. Supp. 2d 246, 259 (D.D.C. 2005).

cases that originally held that a plaintiff need not plead every element of the prima facie case

were decided before *Twombly* and *Iqbal* and relied on the less demanding pleading standard from

*Conley v. Gibson*, 355 U.S. 41 (1957), which *Twombly* and *Iqbal* abrogated.  *See, e.g.*, *Rochon v.*

*Gonzales*, 438 F.3d 1211, 1220 (D.C. Cir. 2006) ("[I]n order to survive a motion to dismiss, all

the complaint has to say is 'the government retaliated against me because I engaged in protected

activity.'" (additional internal quotation marks and citation omitted)); *Sparrow v. United Air*

*Lines, Inc.*, 216 F.3d 1111, 1114–15 (D.C. Cir. 2000) (explaining that a plaintiff need not plead

all the elements of the prima facie case, in part, because under pre-*Iqbal* precedent, "[a] plaintiff

need not allege all the facts necessary to prove its claim" (internal quotation marks and citation

omitted)).

    In the Court's view, this debate is largely illusory.  As the Supreme Court recently

observed, "what the plaintiff must plausibly allege at the outset of a lawsuit" turns on "what the

plaintiff must prove in the trial at its end."  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned*

*Media*, 140 S. Ct. 1009, 1014 (2020).  In the context of a discrimination claim, this means that

the *Swierkiewicz* rule remains good law and that a plaintiff need not—but may—plead a prima

facie case, for the following reasons.  First, as the D.C. Circuit has explained, "it would be . . .

odd [to] require[]" a plaintiff to plead the elements of a prima facie case because, ultimately, a

plaintiff could prevail "by producing direct evidence of discrimination."  *Gordon v. U.S. Capitol*

*Police*, 778 F.3d 158, 161–62 (D.C. Cir. 2015).  In other words, use of a prima facie case is one

way, but not the only way, that a Title VII or § 1981 plaintiff can prove her case at trial.

    Second, "*McDonnell Douglas* sought only to supply a tool for assessing claims, typically

at *summary judgment*, when the plaintiff relies on indirect proof of discrimination."  *Comcast*

*Corp.*, 140 S. Ct. at 1019 (emphasis added).  But, as in the context of standing, the plaintiff's

burden for proving her claim varies based on "the successive stages of the litigation," *Lujan v.*
*Defs. of Wildlife*, 504 U.S. 555, 561 (1992), and, at the motion to dismiss stage, the plaintiff need
not detail exactly how she will prove her case at trial or even what evidence she will offer to fend
off a motion for summary judgment.  Instead, all that is required is that the plaintiff allege
enough facts to put the defendant on notice of the nature of her claim, *see* Fed. R. Civ. P. 8(a)(2),
and to "allow[] the court to draw the reasonable inference that the defendant is liable for the
misconduct alleged," *Iqbal*, 556 U.S. at 678.  The Court's task at the motion to dismiss stage is
thus to determine whether the Title VII or § 1981 plaintiff has alleged enough "to 'nudge[] [her]
claims' of invidious discrimination 'across the line from conceivable to plausible,'" *id.* at 680
(quoting *Twombly*, 550 U.S. at 570).  The plaintiff may do so by alleging the elements of the
prima facie case, or the plaintiff may allege other facts sufficient to allow the court, drawing on
the specific context, "its judicial experience[,] and common sense," *id.* at 679, to conclude that
the plaintiff has plausibly alleged facts showing that "the employer intentionally discriminated
against the employee on the basis of race."[3]  *Ayissi-Etoh*, 712 F.3d at 576.

     Although the motion to dismiss Yazzie's § 1981 claims on the merits presents a close
question (especially with respect to her race discrimination claim), the Court concludes that
Yazzie has plausibly alleged what she will need to prove at trial.  The Court considers each of
her three § 1981 claims in turn.

---

[3]  Adding to potential confusion about what a plaintiff must plead to survive a motion to dismiss
in a discrimination case, the relevant caselaw uses the word "elements" in two different ways.
Although a plaintiff need not plead her claim in the form of the elements of the prima facie case, a
plaintiff still must plead facts that are sufficient to plausibly allege all of the essential elements
of her statutory claim.  The "legal elements themselves do not change" at the successive stages
of a case, but how much proof a plaintiff must offer in support of those elements does.  *Comcast
Corp.*, 140 S. Ct. at 1019.

1.    *Race Discrimination*

Yazzie's § 1981 disparate treatment claim against NOW alleges that she was demoted,

suspended, and ultimately discharged based on her race.  Dkt. 1-3 at 26–29 (Compl. ¶¶ 90–99).

As explained above, to prevail on this claim, Yazzie will ultimately need to prove that NOW

intentionally discriminated against her based on her race.  *Ayissi-Etoh*, 712 F.3d at 576.  For

present purposes, however, the Court need only decide whether she has alleged enough to state a

plausible claim.  Although a close question, the Court concludes that she has.

In their motion to dismiss, Defendants concede that Yazzie has adequately alleged "a

contractual relationship between herself and Defendant NOW[] and that she experienced an

adverse employment action."  Dkt. 8-1 at 7.  As such, their only argument for dismissal of this

claim is that "none of [Yazzie's] allegations demonstrate a racially discriminatory purpose for

any alleged employment decisions."  *Id.*  In support of this contention, they make two points.

First, they note that Yazzie "was removed in accordance with NOW's bylaws by a two-third

vote," and, second, they contend that Yazzie's allegations of mistreatment are not "link[ed] . . .

to her race."  *Id.*

The first of these arguments is easily rejected.  To the extent Defendants intend to suggest

that the action of the Board insulates the discharge decision from Van Pelt's motives, this Court

recognizes the "cat's paw" theory of discrimination.  Under that theory, "an employer can be

liable when a direct supervisor harbors discriminatory animus and influences the ultimate

decision maker, even if that decision maker lacks any discriminatory animus."  *Noisette v. Lew*,

211 F. Supp.3d 73, 94, (D.D.C. 2016) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011)).

"To prevail on a 'cat's paw' theory, the plaintiff must show that '(1) [the direct] supervisor

perform[ed] an act motivated by discriminatory animus (2) that [was] *intended* by the [direct]

supervisor to cause an adverse employment action, and . . . (3) that act [was] a proximate cause

of the ultimate employment action.'" *Id.* (alterations in original) (quoting *Morris v. McCarthy*,

825 F.3d 658, 668 (D.C. Cir. 2016)).  Here, Yazzie has alleged enough to clear this hurdle at the

motion to dismiss stage.  She plausibly alleges that the Board terminated her at the "direction of

Van Pelt," Dkt. 1-3 at 21 (Compl. ¶ 21), who was allegedly motivated by racial animus to push

for Yazzie's dismissal over the course of several months, *see, e.g.*, *id.* at 13–16 (Compl. ¶¶ 46,

49–50).  Moreover, Defendants focus exclusively on the ultimate discharge decision and say

nothing about Yazzie's allegations that she was also subject to an unlawful suspension and

demotion.

   In reply, Defendants also cite caselaw for the proposition that "when the person who

made the decision to fire was the same person who made the decision to hire, it is difficult to

impute to that person an invidious motivation that would be inconsistent with the decision to

hire, especially when the firing has occurred only a short time after hiring."  Dkt. 16 at 7 (citing

*Hicklin v. McDonald*, 235 F. Supp. 3d 242, 248 (D.D.C. 2017)).  That may be true in the usual

course, but the circumstances alleged here are somewhat unusual.  Generally speaking, "the

person who ma[kes] the decision to hire" is not basing that decision on whether it will help the

person to win an election.

   Defendants' second argument is far more substantial and presents a close question.  In

Defendants' view, Yazzie's complaint "is a recitation of various events involving Defendants

about which [Yazzie] felt mistreated," without alleging any causal connection between Yazzie's

Diné American status and that mistreatment.  As the Supreme Court recently held, a § 1981

"plaintiff must initially plead and ultimately prove that, but for race, [she] would not have

suffered the loss of a legally protected right."  *Comcast Corp.*, 140 S. Ct. at 1019.  In arguing

that Yazzie has not made the requisite showing of but-for causation, Defendants rely on cases from this Court holding that a plaintiff cannot state a claim by simply alleging that she is a member of a protected group, but instead must show that racial discrimination motivated the adverse employment action. *See, e.g.*, *Apollo v. CVS Pharmacy*, No. 17-cv-1775, 2019 WL 147475, at *2 (D.D.C. Jan. 9, 2019) ("A plaintiff cannot merely invoke his or her race in the course of a claim's narrative and automatically be entitled to pursue relief." (internal quotation marks, brackets, and citation omitted)).

In her opposition, Yazzie argues that she has stated a discrimination claim by alleging that Van Pelt chose Yazzie as her running mate solely to exploit Yazzie's racial identity for her own benefit and that, as soon as they were elected, Van Pelt ostracized Yazzie and prevented her from doing her job.  Dkt. 15 at 31–32.  Rather than her ultimate termination, Yazzie relies on several other alleged adverse employment actions.  She points to Van Pelt's removal of Yazzie from the budget process, despite her position as the organization's Treasurer and her years of experience working with NOW's budget, Dkt. 1-3 at 5 (Compl. ¶ 22); removal of Yazzie as a co-signer of checks, including by creating a stamp with Yazzie's signature that Van Pelt kept locked in her own office, *id.* at 6 (Compl. ¶ 24); exclusion of Yazzie from NOW's financial software, *id.* at 8 (Compl. ¶ 29); removal of Yazzie from the workplace, following Van Pelt's ultimatum, the changing of the locks, and the attendant commandeering of Yazzie's email account, *id.* at 14 (Compl. ¶ 44); the promotion of a part-time archivist to take over Yazzie's responsibilities in a new chief of staff role, *id.* at 12 (Compl. ¶ 41); and the physical confrontation between Van Pelt and Yazzie following Yazzie's participation in Martin Luther King Day events, *id.* at 8 (Compl. ¶¶ 30–31).

It is far from clear that each of these "unfavorable action[s]," standing alone, would "give[] rise to an inference of discrimination." *Stella*, 284 F.3d at 145. But when considered in in light of the further background set forth in the complaint, the Court is satisfied that Yazzie has pled enough to survive a motion to dismiss. Most significantly, Yazzie does not merely allege that Van Pelt dramatically curtailed her duties and ultimately pushed her aside, but also alleges that her "job performance was always satisfactory and was usually excellent," Dkt. 1-3 at 27 (Compl. ¶ 92); that Yazzie brought to the job more than a decade of experience "with the annual budgeting process through her tenure as a Board member serving on NOW's [B]udget [C]ommittee," *id.* at 4 (Compl. ¶ 17); and that Van Pelt and her surrogates unfairly accused Yazzie of financial misconduct, *id.* at 13–14, 19–20 (Compl. ¶¶ 46, 57, 61). These facts give rise to at least a plausible inference that any stated race-neutral reasons for the adverse actions were pretextual. *See Stella*, 284 F.3d at 144; *see also Brady v. Off. of Sergeant at Arms*, 520 F.3d 490, 495 (D.C. Cir. 2008).

Yazzie also alleges that Van Pelt treated other women of color in a similarly abusive manner, whether by repeatedly demoting them without explanation, *id.* at 6, 12 (Compl. ¶¶ 23, 43); shouting at them when their work did not meet her standards, Dkt. 1-3 at 6–7 (Compl. ¶¶ 25–26); or firing them based in part on their desire to involve NOW in more advocacy related to issues of racial equality, *id.* at 17–18 (Compl. ¶¶ 52–54). And Yazzie further alleges that Van Pelt repeatedly claimed to have chosen Yazzie as her running mate only "because the campaign needed a 'women of color' to get elected," *id.* at 5 (Compl. ¶ 20), and that Van Pelt criticized Yazzie and other NOW staff members for focusing too much "on issues of concern to Native American [w]omen," *id.* at 18 (Compl. ¶ 55), or Black women, *id.* at 17 (Compl. ¶ 53). These allegations plausibly support Yazzie's contention that Van Pelt viewed the office in racially

polarizing (and stereotyping) terms and saw women of color as a threat to her desire to focus NOW's work exclusively on issues of sex discrimination.

The Court concludes that these allegations, taken together, are sufficient to survive a motion to dismiss. There may well be a very different explanation for Van Pelt's actions, but Defendants will have to wait for summary judgment to present their side of the story.

       2.     *Hostile Work Environment*

For her hostile work environment claim against NOW under § 1981, Yazzie must demonstrate that "(1) . . . she is a member of a protected class; (2) . . . she was subjected to unwelcome harassment; (3) the harassment occurred because of [her] protected status; (4) the harassment was severe to a degree which affected a term, condition, or privilege of employment, and (5) the employer knew or should have known about the harassment, but nonetheless failed to take steps to prevent it." *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 189 (D.D.C. 2012); *see also Ayissi-Etoh*, 712 F.3d at 577. "To determine whether a hostile work environment exists, the court looks to the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008).

The standard applicable to a hostile work environment claim is demanding. "The workplace environment becomes 'hostile' for purposes of [§ 1981] only when the offensive conduct 'permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Nurriddin v. Goldin*, 382 F. Supp. 2d 79, 107 (D.D.C. 2005), *aff'd sub. nom. Nurriddin v. Griffin*, 222 F. App'x 5 (D.C. Cir. 2007) (alteration in original) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). The "conduct

must be extreme" and must create an environment that is "both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998). "The standard is meant to be 'demanding' enough 'to ensure that [§ 1981] does not become a general civility code' or create liability for 'the ordinary tribulations of the workplace.'" *Fields v. Vilsack*, 207 F. Supp. 3d 80, 92 (quoting *Faragher*, 524 U.S. at 788). Moreover, the plaintiff must also allege that the abusive work environment "was the result of discrimination" based on race. *See Nurriddin*, 382 F. Supp. 2d at 107.

Defendants argue that Yazzie has failed to state a claim based on the allegedly hostile work environment at NOW because "[n]one of [Yazzie's] allegations demonstrates a sufficiently severe or pervasive pattern of behavior." Dkt. 8-1 at 8. But in the same paragraph, Defendants acknowledge that Yazzie alleges "over a dozen instances where Defendant Van Pelt allegedly interfered with Plaintiff's job performance." *Id.* Defendants argue that these instances "are mere examples of employment-related slights or employer-employee disagreements regarding management decisions." *Id.* at 9.

In considering the totality of the circumstances, the Court concludes that Yazzie has plausibly alleged a hostile work environment at NOW, for several reasons. In isolation, some of Van Pelt's actions, like removing Yazzie's access to NOW's payroll software or transferring some of Yazzie's responsibilities to Seigel, might be fairly viewed as the sorts of day-to-day management decisions that are part and parcel of running an organization. But here, Van Pelt allegedly excluded Yazzie from the budget process *and* from the payroll system *and* from signing checks *and* from accessing her own email account *and* from coming into the office. In combination, these various measures gave NOW's Vice President and Treasurer almost no role

within the organization.  Certainly, when Van Pelt locked Yazzie out of both her email and her office and transferred her responsibilities to Seigel, despite the roles and responsibilities assigned to Yazzie under the NOW bylaws, that changed the terms and conditions of Yazzie's employment.  What's more, these pervasive slights to Yazzie went beyond management decisions and turned physical on January 29, 2018, when Van Pelt allegedly berated Yazzie, "threw papers at her, bumped her (i.e., body slammed Yazzie)[,] and cornered [her]."  Dkt. 1-3 at 8 (Compl. ¶ 31).

In a single sentence, Defendants also argue that Yazzie's hostile work environment claim fails because she "does not allege any facts to show these management decisions were motivated by her race, Diné American."  Dkt. 8-1 at 9.  For the reasons discussed above, the Court is not convinced—at least at this early stage of the proceeding.  The complaint's allegations related to Van Pelt's pattern of abusive behavior toward women of color in the workplace are particularly relevant to the hostile work environment claim.  Yazzie alleges that Van Pelt repeatedly exhibited hostility toward employees of color and that those employees, in turn, raised concerns about the environment to the NOW Board.  Yazzie alleges that Van Pelt demoted Mulligan, who is Asian-American, multiple times and criticized her in front of the staff, until she quit, *id.* at 6, 12 (Compl. ¶¶ 23, 43); fired Barrett, who is African-American, after shouting at her on multiple occasions for paying departing employees what they were owed for accrued vacation time, *id.* at 6–7, 11 (Compl. ¶¶ 25–26, 39); and fired Oliver, who is African-American, after repeatedly criticizing her for focusing too much about issues affecting Black women, *id.* at 17–18 (Compl. ¶ 52–54).

Significantly, when staff members spoke out to the Board about the hostile work environment at NOW's headquarters, they characterized the hostility in terms of race.  When

several staff members wrote to the Board after Yazzie was forced to go on leave in May 2018, they "claim[ed] to have witnessed Van Pelt's disrespectful and intimidating treatment of staff members of color," including "physically intimidating and aggressive treatment of Yazzie and other women of color by Van Pelt." *Id.* at 13 (Compl. ¶ 45). Likewise, when Vicki Linton resigned in July 2018, she wrote to the Board about racial hostility at NOW, explaining that she found "the treatment of Gilda Yazzie deeply troubling." *Id.* at 15–16 (Compl. ¶ 49).

Defendants claim that NOW employs fewer than fifteen people, and yet, in the course of less than two years, at least five employees were fired or quit in circumstances involving alleged racial hostility in the workplace, as reflected in multiple letters and other complaints sounding the alarm to the Board of Directors about the hostile environment at NOW headquarters. The Court, accordingly, concludes that Yazzie has plausibly alleged a hostile work environment claim.

3. *Retaliation*

Finally, for her retaliation claim against NOW under § 1981, Yazzie must show "(1) that [she] engaged in statutorily protected activity; (2) that [she] suffered a materially adverse action by [her] employer; and (3) that a causal link connects the two." *Howard R.L. Cook & Tommy Shaw Found. ex rel. Black Emps. of Library of Cong., Inc. v. Billington*, 737 F.3d 767, 772 (D.C. Cir. 2013) ("*Howard*"); *see also CBOCS West, Inc. v. Humphries*, 553 U.S. 442, 448 (2008) ("42 U.S.C. § 1981 encompasses claims of retaliation."). The standard applicable to Yazzie's retaliation claim differs from the standard applicable to her disparate treatment claim with respect to the severity of adverse action that she must show. A disparate treatment claim requires showing an adverse action that alters the "terms, conditions, or privileges of employment or future employment opportunities." *Ortiz-Diaz v. U.S. Dep't of Hous. & Urb.*

*Dev., Off. of Inspector Gen.*, 867 F.3d 70, 73 (D.C. Cir. 2017).  In the retaliation context, by contrast, adverse action "encompass[es] a broader sweep of actions than in a pure discrimination claim," in that "[r]etaliation claims are 'not limited to discriminatory actions that affect the terms and conditions of employment,'" but also include harms that would dissuade a reasonable employee from engaging in protected activity.  *Baloch*, 550 F.3d at 1198 & n.4 (quoting *Burlington N. & Santa Fe Ry Co. v. White*, 548 U.S. 53, 64 (2006)).

Defendants argue that Yazzie fails to state a claim for retaliation because several months passed between her protected activity and her eventual termination, undermining any possible causal link between her protected activities and her firing.  Dkt. 8-1 at 9–10.  Yazzie responds that her complaint alleges "a series of protected activities and reprisals over a period of many months," during which time she was "progressively isolated from coworkers and subordinates, stripped of authority and power, and ultimately fired."  Dkt. 15 at 33.

"To qualify as protected activity under § 1981," a plaintiff's actions must oppose "a practice that the employee reasonably and in good faith believed was unlawful under § 1981." *Uzoukwu v. Metro. Wash. Council of Gov'ts*, 27 F. Supp. 3d 62, 70 (D.D.C. 2014).  Yazzie argues that her protected activities included opposing racial discrimination at NOW and participating in Board meetings at which racial discrimination at NOW was discussed. Specifically, on January 29, 2018, after the physical altercation with Van Pelt, Yazzie sent a memorandum to the NOW staff, in which she wrote that "[i]t's scary at the National Action Center" and that "[o]f most concern is that [Van Pelt] is patronizing to the people of color staff." Dkt. 1-3 at 9 (Compl. ¶ 32).  At a Board meeting in June 2018, "Yazzie and her supporters complained that Van Pelt's behaviors created a hostile work environment for Yazzie and that there was discrimination against women of color within the NOW [h]eadquarters."  *Id.* at 14

(Compl. ¶ 46).  On October 27, 2018, Yazzie objected to criticism that she was too focused on issues of concern to Native American women, *id.* at 18–19 (Compl. ¶ 55), which she argues was a protected activity, Dkt. 15 at 35–36.  Even at the time of her firing, Yazzie argues, she was participating in a meeting that was supposed to be focused on the Board's investigation of racial discrimination against Oliver.  *Id.* at 36.  The Court is persuaded that, at a minimum, Yazzie's complaints about Van Pelt at the June 2018 Board meeting qualified as protected activity.

Yazzie also alleges that each of these protected activities were met with reprisals from Van Pelt that were "materially adverse."  *Howard*, 737 F.3d at 772.  For the purposes of a retaliation claim, an action is materially adverse if it "would have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Baloch*, 550 F.3d at 1198 (internal quotation marks and citation omitted).  "The Supreme Court has instructed that the universe of cognizable retaliatory actions is broader than that of discriminatory actions, as a reasonable worker could be discouraged from reporting abuse by actions than might not themselves be considered abusive," but, at the same time, retaliation claims are not a means to "micromanage supervisor decisions or sanction trivial harms."  *Swann v. Off. of Architect of Capitol*, 73 F. Supp. 3d 20, 26–27 (D.D.C. 2014), *aff'd* No. 15-5001, 2015 WL 5210251 (D.C. Cir. Aug. 18, 2015).  Here, following Yazzie's memo to the staff in January 2018 about Van Pelt's abusive and patronizing behavior, Van Pelt acted in March and April 2018 to "prohibit" NOW staff "from having any communication" with Yazzie about NOW's payroll software and other matters related to Yazzie's responsibilities as Vice President and Treasurer.  Dkt. 1-3 at 10–11 (Compl. ¶¶ 38, 40).  Then in May 2018, Van Pelt gave Yazzie an ultimatum to either resign or take personal leave.  *Id.* at 13 (Compl. ¶ 44).  After Yazzie again complained to the Board about Van Pelt's allegedly discriminatory actions in June 2018, Van Pelt attempted to have the Board fire

Yazzie at the next meeting in July 2018.  *Id.* at 14, 16–17 (Compl. ¶¶ 46, 50).  At that time, Van Pelt also acted to further isolate Yazzie, "order[ing] Yazzie to cease all contact with NOW staff and Board members."  *Id.* at 17 (Compl. ¶ 51).

The Court concludes that Yazzie has plausibly alleged retaliatory acts by Van Pelt that rise to the level of adversity required to state a claim.  Being pushed either to take leave or to resign, being cut off from communication with her co-workers, and having her boss push for her firing could reasonably be expected to dissuade an employee from engaging in further protected activity.  At times, two months or more passed between Yazzie's protected activity and the allegedly retaliatory acts, but at least at the motion to dismiss stage, those temporal gaps are not so extreme as to raise serious doubt that Van Pelt's adverse actions toward Yazzie were causally linked to Yazzie's protected activities.  Rather, temporal proximity is simply one means of proving a nexus between the protected activity and the adverse action, *see Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C. Cir. 2012), and, here, Yazzie does not rely on temporal proximity alone to support her claim.

The Court, accordingly, concludes that Yazzie has plausibly alleged a retaliation claim under § 1981.

## C.      Counts VII and VIII: Assault and Battery Claims

Defendants move to dismiss Yazzie's assault and battery claims on statute of limitations grounds.  Dkt. 8-1 at 10–11.  D.C. law requires that claims for assault or battery be filed within one year "from the time the right to maintain the action accrues."  D.C. Code § 12-301(a)(4). Here, according to the complaint, the alleged assault and battery occurred on January 29, 2018, at 11:20 a.m., when "Van Pelt followed Yazzie into her office, screamed at her, threw papers at her, bumped her (i.e., body slammed Yazzie)[,] and cornered [her]."  Dkt. 1-3 at 8 (Compl. ¶ 31).

Because more than one year passed between January 29, 2018, when the assault occurred and October 27, 2019, when Plaintiff filed her lawsuit, Defendants argue that her assault and battery claim is time-barred.  Dkt. 8-1 at 10–11.

Because invocation of the statute of limitations is an affirmative defense, courts are hesitant to grant pre-answer motions to dismiss on statute-of-limitations grounds.  *See Firestone v. Firestone*, 76 F.3d 1205, 1208–09 (D.C. Cir. 1996) (per curiam).  A statute-of-limitations defense may be raised under Rule 12(b)(6) only "when the facts that give rise to the defense are clear from the face of the complaint," *Smith-Haynie v. District of Columbia*, 155 F.3d 575, 578 (D.C. Cir. 1998), and a district court should grant a motion to dismiss on statute-of-limitations grounds only if it is satisfied that the claim "is conclusively time-barred," *Firestone*, 76 F.3d at 1209; *see also Jones v. Changsila*, 271 F. Supp. 3d 9, 24 (D.D.C. 2017); *Perrow v. District of Columbia*, 435 F. Supp. 3d 9, 12 (D.D.C. 2020); *Friedman v. Gov't of Abu Dhabi, U.A.E.*, 464 F. Supp. 3d 52, 71 (D.D.C. 2020).

This is one of those rare cases in which dismissal on statute of limitations grounds is appropriate.  First, the date—and indeed, the approximate time of day—when the alleged assault and battery occurred is "clear from the face of the complaint."  *Smith-Haynie*, 155 F.3d at 578. Second, generally speaking, the D.C. Court of Appeals strictly enforces statutes of limitations, without permitting case-by-case tolling, in part because "the District of Columbia is one of a minority of jurisdictions that has not adopted a general equitable 'saving' statute to toll statutes of limitations in cases of reasonable mistake."  *East v. Graphic Arts Indus. Joint Pension Tr.*, 718 A.2d 153, 156 (D.C. 1998).  And third, although the D.C. Court of Appeals does recognize "at least two limited exceptions to [its] generally strict application of statutes of limitations: the lulling doctrine and the discovery rule," *id.*, Yazzie does not argue that these or any other

exceptions to the statute of limitations apply in this case.  In fact, Yazzie does not respond to Defendants' statute of limitations argument at all in her opposition to the motion to dismiss, leaving the statute of limitations issue conceded.  *See generally* Dkt. 15.

The Court thus concludes that Defendants' statute of limitations defense is amenable to resolution at the motion to dismiss stage.  Because Yazzie filed her complaint more than one year after her assault and battery claims accrued, those claims are time-barred.  Defendants' motion to dismiss will be granted with respect to Counts VII and VIII.

**D.      Count IX: Defamation Claims**

Defendants also move to dismiss Yazzie's defamation claims against Corbin and Drabek based on the "common interest" privilege, Dkt. 8-1 at 11–12, and they move to dismiss her defamation claim against Van Pelt for failure to state a claim, *id.* at 13.[4]

**1.      *Claims Against Corbin and Drabek***

The Court begins with the claims against Corbin and Drabek.  Yazzie alleges that Corbin, on December 27, 2018, sent an email to Yazzie and the NOW Board of Directors stating that NOW "cannot have someone in our NAC that was embezzling money from our organization, and actively working to turn staff against the President," referring to Yazzie.  Dkt. 1-3 at 19 (Compl. ¶ 57).  And she alleges that at a Board meeting on January 25, 2019, Drabek accused Yazzie of "illegally us[ing] the NOW credit card."  *Id.* at 20 (Compl. ¶ 61).

---

[4]  Yazzie's defamation claim against NOW asserts that the organization "knew of the conduct of [the] individual Defendants[,] and it either knew or should have known said accusation[s] w[ere] false but ratified said conduct."  Dkt. 1-3 at 36 (Compl. ¶ 133).  Her defamation claim against NOW is thus derivative of her claims against the individual Defendants.  In their motion to dismiss, Defendants do not make any separate arguments with respect to the defamation claim against NOW, instead devoting their attention to the claims against the individual Defendants. Because the Court concludes that Yazzie's defamation claims against the individual Defendants survive the motion to dismiss, her claim against NOW survives as well.

To state a claim for defamation under D.C. law, a plaintiff must plead "'four elements: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.'" *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 140–41 (D.D.C. 2017) (quoting *Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009)).  Defendants contend that Corbin's and Drabek's statements were not published "without privilege" because the qualified common interest privilege protects them.  Dkt. 8-1 at 12.  Under D.C. law, for the common interest privilege to apply, "the statement must have been (1) made in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty, (3) to a person who has such a corresponding interest."  *Blodgett v. Univ. Club*, 930 A.2d 210, 223–24 (D.C. 2007). Defendants argue that the members of the NOW Board of Directors shared a common interest in the administration of the organization and that, therefore, Yazzie's "conduct as an officer of NOW and her working relationship with the NOW President," including "whether [Yazzie] had mishandled or misused NOW funds and/or NOW's credit card," were matters of common interest to the Board members, including Defendants.  Dkt. 8-1 at 12.  Defendants posit that because Corbin and Drabek made their statements only internally to the other Board members, the common interest privilege protects those communications.  *Id.*

Plaintiff responds, and the Court agrees, that the question of whether the common interest privilege applies is not fit for resolution at the motion to dismiss stage.  *See* Dkt. 15 at 39–40. The common interest privilege, like the statute of limitations, is an affirmative defense, and thus

the privilege may be raised at the motion to dismiss stage only if the facts necessary to support the defense are clear from the face of the complaint. *Smith-Haynie*, 155 F.3d at 578. Tellingly, the cases on which Defendants rely were all decided at the summary judgment stage. *See Blodgett*, 930 A.2d at 217; *Wood v. Am. Fed'n of Gov't Emps.*, 316 F. Supp. 3d 475, 482 (D.D.C. 2018). In the *Wood* case, this Court granted summary judgment to the defendants on a defamation claim based on the common interest privilege. *Id.* But in the same case, the Court had rejected the defendants' privilege argument at the motion to dismiss stage:

> Little need be said of this [privilege] argument at this stage of the case. Defendant cannot conclusively establish all of the elements of a [privilege] defense based solely on Plaintiff's pleadings, the content of which the Court accepts as true at this preliminary stage in the case. Instead, this defense presents factual disputes that will have to be resolved at a later stage.

*Wood v. Am. Fed'n of Gov't Emps.*, 255 F. Supp. 3d 190, 198 (D.D.C. 2017). The same is true here. The applicability of the common interest privilege to the statements from Corbin and Drabek depends on whether their allegations against Yazzie were "made in good faith." *Blodgett*, 930 A.2d at 224 (D.C. 2007). After discovery, Defendants may be able to show that Corbin and Drabek believed their accusations were true or even that the accusations were in fact true. But at this stage, the Court is limited to the facts alleged on the face of the complaint, and nothing in the complaint substantiates that Corbin and Drabek acted in good faith. On the contrary, Yazzie alleges some facts that at least raise questions about the motivations of Corbin and Drabek in accusing Yazzie of embezzling money and of using the NOW credit card illegally. She alleges, for example, that Drabek's statement about Yazzie's credit card use was part of an effort by Van Pelt's supporters to "hijack[]" a Board meeting that was supposed to focus on Oliver's claims of racial discrimination. Dkt. 1-3 at 20 (Compl. ¶ 61).

Defendants' motion to dismiss Yazzie's defamation claims against Corbin and Drabek based on the common interest privilege will therefore be denied.[5]  Defendants are free, of course, to raise their privilege-based argument again at the summary judgment stage, supported by appropriate evidence.

2.   *Claim Against Van Pelt*

Defendants move to dismiss Yazzie's defamation claim against Van Pelt on the ground that the complaint fails to state a claim.  Dkt. 8-1 at 13.  Defendants argue that Yazzie "does not specifically state in her Complaint the time and place of the publication" of Van Pelt's allegedly defamatory statements or "to whom" those statements were made.  *Id.*  That is not quite right.  Yazzie alleges that at a Board meeting in July 2018, Van Pelt "accuse[d] Yazzie of being a person of poor moral standards."  Dkt. 1-3 at 16 (Compl. ¶ 50).  The complaint thus alleges the time and place of Van Pelt's allegedly defamatory statement (the Board meeting in July 2018), what Van Pelt allegedly said (that Yazzie has poor morals), and to whom she published this statement (the Board of Directors).  Defendants' argument is thus unavailing.

It is possible that Yazzie's defamation claim against NOW and Van Pelt will fail for some other reason.  A statement that someone has poor morals may qualify as an opinion, and statements of opinion are generally not actionable under D.C. law, unless they imply provably false facts.  *See Competitive Enter. Inst. v. Mann*, 150 A.3d 1213, 1241 (D.C. 2016), *as amended* (Dec. 13, 2018) ("Expressions of pure opinion, as embodiments of ideas, are generally entitled to

---

[5]  Matters might be different if D.C.'s anti-SLAPP law (short for "strategic lawsuits against public participation"), which provides a special mechanism for the early dismissal of certain defamation claims, applied in federal court.  But the D.C. Circuit recently reaffirmed that it does not.  *Tah v. Glob. Witness Publ'g, Inc.*, No. 19-7132, 2021 WL 1045205, at *4–5 (D.C. Cir. Mar. 19, 2021).  Rather, federal courts apply Rules 12 and 56 to defamation claims just like every other type of claim.

constitutional protection," but "[s]tatements of opinion can be actionable if they imply a provably false fact, or rely upon stated facts that are provably false." (internal quotation marks and citations omitted)).  But Defendants in their motion to dismiss do not argue that Van Pelt's statement was not actionable because it was a constitutionally protected opinion, and the Court will not consider an issue that Defendants did not raise without first giving Yazzie a chance to respond.  Defendants' motion to dismiss Van Pelt's defamation claim will therefore be denied.

## CONCLUSION

For the foregoing reasons, it is hereby **ORDERED** that Defendants' motion to dismiss is **GRANTED** in part and **DENIED** in part.  The motion is **GRANTED** with respect to Yazzie's assault and battery claims in Counts VII and VIII, and those counts are **DISMISSED**.  The motion to dismiss is **DENIED** in all other respects.

**SO ORDERED**.

/s/ Randolph D. Moss
RANDOLPH D. MOSS
United States District Judge


Date:  March 30, 2021