**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

GILDA YAZZIE,

        *Plaintiff*,

    v.

NATIONAL ORGANIZATION FOR
WOMEN, *et al.*,

        *Defendants*.

Civil Action No. 19-3845 (RDM)

---

**MEMORANDUM OPINION AND ORDER**

In 2017, Toni Van Pelt and Gilda Yazzie ran on the same ticket to serve four-year terms, respectively, as President and Vice President of the National Organization for Women ("NOW"). They campaigned and won election together. That, however, is where their collaboration ended. Although all agree that the relationship soured soon after they took office, Yazzie and Van Pelt characterize the relevant events in starkly different terms. On Yazzie's telling, Van Pelt told NOW staff members that she ran on the same ticket with Yazzie only because she needed a woman of color on the ticket (Yazzie is Native American), and Van Pelt almost immediately moved to oust Yazzie from office because of her race. According to Yazzie, Van Pelt excluded her from the budget process, even though the Vice President was supposed to act as the organization's Treasurer; locked her out of the office and out of her email account; physically assaulted her; falsely accused her of financial misdeeds; and, more generally launched what was essentially a second campaign—this time to convince NOW's National Board to terminate Yazzie. In contrast, on Van Pelt's telling, Yazzie did, in fact, engage in financial misdeeds and,

more generally, was not up to the task of serving as the organization's Vice President.  The National Board eventually sided with Van Pelt and terminated Yazzie.

Yazzie then brought this action against NOW, Van Pelt, and two NOW National Board members, Cynthia Drabek and Beth Corbin ("Defendants").  As initially framed, her complaint asserted claims for race discrimination, hostile work environment, and retaliation under Title VII and 42 U.S.C. § 1981, and state law claims for assault, battery, and defamation.  Dkt. 1-3 (Compl.).  The Court, however, previously dismissed Yazzie's claims for assault and battery. Dkt. 17.

The parties have completed and discovery, and the matter is now before the Court on Defendants' Motion for Summary Judgment with respect to Yazzie's remaining claims.  Dkt. 30. For the reasons explained below, the Court will **DENY** that motion with regard to the Title VII and section 1981 claims and will **GRANT** in part and **DENY** in part that motion with respect to Yazzie's defamation claim.

## I.  BACKGROUND

### A.    Factual Background

For purposes of resolving the motion for summary judgment, the Court takes "the facts in the record and all reasonable inferences derived therefrom in a light most favorable" to the non-moving party.  *Coleman v. Duke*, 867 F.3d 204, 209 (D.C. Cir. 2017) (quoting *Al-Saffy v. Vilsack*, 827 F.3d 85, 89 (D.C. Cir. 2016)).  Understood in that light, the relevant background is as follows.

NOW is a grassroots feminist organization that has chapters across the United States and is headquartered in Washington, D.C.  Dkt. 30-2 at 9.  The organization is led by a National Board of Directors ("National Board" or "Board") and by two elected officers, the President and

Vice President, who are chosen every four years at NOW's National Conference. Dkt. 30-1 at 1, 3 (Defs. SUMF ¶¶ 1, 12). The National Board is divided into various committees, including an Audit Committee, which "is responsible for ensuring the [o]rganization has effective internal controls over financial reporting," *id.* at 4 (Defs. SUMF ¶¶ 22), an Executive Committee, and a Budget Committee. Under the organization's bylaws, the President serves as the Chief Executive Officer and Chief Financial Officer, while the Vice President serves as the Treasurer and performs other duties as assigned by the President and the Board. *Id.* at 3 (Defs. SUMF ¶¶ 13–15). NOW contracts with Halt Buzas and Powell, LLC as its independent auditors. *Id.* at 4 (Defs. SUMF ¶ 24). NOW also employs staff members who assist in running the organization. According to Yazzie, from "July 17, 2017 to July 31, 2017, . . . NOW employed 22 individuals." Dkt. 33-3, at 1 (Pl. Resp. to Defs. Fact 4). NOW disagrees and counters that from "July 17, 2017 to May 17, 2019, [it] employed 14 or fewer employees" at any given time. Dkt. 30-1 at 2 (Defs. SUMF ¶ 4).

At NOW's July 2017 National Conference, Toni Van Pelt was elected to serve as President of the organization, and Gilda Yazzie was elected to serve as Vice President. *Id.* at 3 (Defs. SUMF ¶ 12). Yazzie identifies as Native American and Dine (Navajo). Dkt. 33-4 at 1 (Pl. SUMF ¶ 1). In the lead-up to the election, Yazzie and Van Pelt campaigned together. Dkt. 33 at 9. According to NOW, Yazzie "prepared campaign material in which she identified as an enrolled member of the Navajo Nation." Dkt. 30-1 at 2 (Defs. SUMF ¶ 7). Yazzie disputes this, asserting that she did not prepare the "campaign materials" and that she "saw them for the first time when she arrived at the National Conference." Dkt. 33-3 at 2 (Pl. Resp. to Defs. Fact 7); *see also* Dkt. 33-4 at 1 (Pl. SUMF ¶ 2). Yazzie also appeared with Van Pelt several times during the campaign. Dkt. 33-4 at 2 (Pl. SUMF ¶ 3). Yazzie claims that "[e]ach time, Van Pelt

3

introduced Yazzie as '100% Navajo[]' or 'Native American.'" *Id.* Yazzie found this "blood quantum counting racist and offensive." *Id.* (Pl. SUMF ¶ 4).

During the election, Van Pelt treated Yazzie "in a friendly manner." Dkt. 33-4 at 2 (Pl. SUMF ¶ 5). After the election, that changed. On Yazzie's account, Van Pelt "no longer treated [her] with a friendly demeanor;" she avers that Van Pelt's interactions with her "were unsmiling and minimal." Dkt. 33-4 at 2 (Pl. SUMF ¶ 6). "There was no argument or even conversation between" them; rather, according to Yazzie, Van Pelt "simply refused to communicate or communicated in minimal ways." *Id.* "During the initial two weeks of training," for example, "Van Pelt refused to speak or meet with . . . Yazzie privately." Dkt. 33-4 at 2–3 (Pl. SUMF ¶ 7). When they began their term, Van Pelt purportedly "refused to include Yazzie in email" exchanges or in "meetings related to operating the organization or any other purpose." Dkt. 33-4 at 3 (Pl. SUMF ¶ 9). Yazzie further avers that "Van Pelt as President/CFO was required to provide Yazzie, in her role as Treasurer, with monthly financial reports to enable [her] to perform her job as Vice President," but she never did so. Dkt. 33-4 at 3 (Pl. SUMF ¶ 10). More generally, Yazzie maintains that she "was never given access to the NOW financial accounting software n[o]r was she allowed to log into it at any time." Dkt. 33-4 at 3 (Pl. SUMF ¶ 11). Instead, she received only staff-level (as opposed to officer-level) access to the NOW local area network passwords and programs. Dkt. 33-4 at 3–4 (Pl. SUMF ¶ 12). Emily Imhoff, who served at relevant times as the President's assistant and later as Coordinator of the President's Office, corroborates aspects of this account, attesting that Van Pelt froze Yazzie "out of the administration: refusing to speak with her, [to] include her in meetings, or [to] include her in important email threads." Dkt. 33-1 at 39 (Imhoff Decl. ¶ 3).

Van Pelt and Yazzie's relationship deteriorated further in 2018.  Although the parties dispute precisely what occurred, tensions reached a zenith on January 29, 2018.  As Yazzie recounts events:

> On the morning of January 29, 2018, I was meeting with Linda Berg in her office.  [A]t 11:20 a.m., Toni Van Pelt interrupted the meeting and started yelling at me.  I was intimidated by her yelling and immediately retreated to my office[] but was pursued by Toni Van Pelt.  When I got to my office, Toni Van Pelt went in after me and backed me into a corner behind my desk using her body.  From the expressions on her face and her tone of voice, Toni looked angry.  She was yelling: "You won't be here for three years!" "I am the president, so you have to do what I say!" "You don't understand" and "You [']P.O.C.[']"  Toni Van Pelt cornered me in my office, she threw papers, grabbed my arm and bumped (body slammed) me.  Toni Van Pelt is much taller than me, I was frightened.  I was able to get out of my office and returned to Linda Berg's office. . . .  Berg accompanied me back to my office, while Toni Van Pelt backed off. . . .  Van Pelt said "P.O.C" phonetically, in a hostile manner as if it were a slur and a way to indicate that people of color were somehow a different set of individuals.

Dkt. 33-1 at 7 (Yazzie Decl. ¶ 13).  According to Yazzie, she had "heard the term P.O.C. used in NOW before," simply as a shorthand for "'People of Color.'"  Dkt. 33-1 at 7 (Yazzie Decl. ¶ 14).  But, on Yazzie's telling, Van Pelt used the phrase "*You* P.O.C.'s" in a derogatory and hostile manner "when complaining to [Yazzie] or the staff."  *Id.* (emphasis added).  Used in this way, "it seemed like a racial epithet and a way to indicate a separate class of people."  *Id.* at 8.  Defendants dispute these allegations and contend that Yazzie's characterization of Van Pelt's meaning constitutes "improper speculation and conjecture."  Dkt. 34-3 at 9.

Following the January 29, 2018 incident, Yazzie sent various communications to the staff and leadership.  First, she "sent a text message to NOW staff in which she [stated that] she had been 'physically threaten[ed] in a demeaning situation by Toni Van Pelt'" and that "'Van Pelt has created a hostile workplace for me.'"  Dkt. 33-4 at 8 (Pl. SUMF ¶ 33); *see also* Dkt. 33-1 at 23 (Yazzie Decl. Ex. A).  Second, Yazzie sent a message to the National Board and staff describing how Van Pelt had allegedly "threaten[ed] [her] with aggressive behavior, physical and

verbal[,]" and threatened, among other things, that "'it won't be 3 more years.'"  Dkt. 33-1 at 25 (Yazzie Decl. Ex. B).  In that message, Yazzie emphasized her concern that Van Pelt was "patronizing to the people of color staff."  *Id.*

Then, on February 5, 2018, Yazzie wrote to NOW's Advisory Committee, "which at the time consisted of former NOW Vice President Bonnie Grabenhofer, former U.S. Senator . . . Carol Mosely Braun, attorney Carol Robles Roman[,] and former NOW President Eleanor Smeal."  Dkt. 33-1 at 8 (Yazzie Decl. ¶ 18); *see also id.* at 27 (Yazzie Decl. Ex. C).  In that letter, Yazzie informed the Advisory Committee about the January 29, 2018, incident, which she characterized as "escalat[ing] from verbal abuse to the physical [stalking] of [her] in the office," and she explained that, since then, she had avoided Van Pelt and spent "fewer hours at the office" "to prevent [any] further altercation."  Dkt. 33-1 at 27 (Yazzie Decl. Ex. C).  To facilitate the communications between herself and Van Pelt that were necessary for her work, Yazzie suggested employing an intermediary, Anne Durand, who could "aid [her] in communication with" Van Pelt.  *Id.*  The National Board hired Durand in February 2018.  Dkt. 30-1 at 3 (Defs. SUMF ¶ 19).  On Defendants' view, Durand was hired at the request of National Board member Grabenhofer, and "Durand's role was not to resolve differences but[,] rather[,] to facilitate communication so the officers could have a shared agenda and continue to conduct NOW's important business."  *Id.* (Defs. SUMF ¶¶ 19–20).

Difficulties continued into the year.  On March 28, 2018, Van Pelt allegedly interrupted a conversation between Yazzie and NOW employee Rachel Motley about NOW's payroll system, Paychex.  Dkt. 33-3 at 4 (Pl. Resp. to Defs. Fact 24).  Yazzie describes that software as "something that was within [her] job description," and describes herself as being "a point of contact for Paychex."  Dkt. 33-1 at 9 (Yazzie Decl. ¶ 20).  According to Yazzie, "Van Pelt

instructed Motley to have no further conversations with Yazzie on Paychex related matters. Days later, Van Pelt removed [her] access to the Paychex system." Dkt. 33-3 at 4 (Pl. Resp. to Defs. Fact 24). The parties offer contrasting views about this interaction and the lead-up to Van Pelt's instruction that Yazzie be relieved of her financial duties, including over the Paychex system. *Id.*

On Defendants' telling, "[a]fter being alerted to certain banking irregularities, and discovery of several other financial concerns by NOW's independent auditors Halt Buzas and Powell, LLC, the Audit Committee, on April 10, 2018, recommended that . . . Yazzie be removed from all financial duties, approvals and other related transactions, including access to the Paychex electronic payroll system." Dkt. 30-1 at 4 (Defs. SUMF ¶ 24). Then, "[o]n or about May 19, 2018, the National Board received an audit report from the auditors summarizing their findings," which "highlighted 'deficiencies in internal control' and several instances of financial mismanagement by the Vice President." Dkt. 30-1 at 4 (Defs. SUMF ¶¶ 25–26). In particular, the Audit Committee was concerned that (1) Yazzie was "reimbursed twice for a $465 airline ticket," (2) "Yazzie used the [o]rganization's credit card to pay her personal rent," (3) "Yazzie signed her own expense reports when the [o]rganization's expense reimbursement policy required that the President approve her expenses," (4) "[o]n two separate occasions . . . Yazzie signed a petty cash check to herself for $500 without notice to, or approval by, . . . Van Pelt," (5) Yazzie received "several more duplicate payments . . . including for cable expenses in the amount of $108.07," and (6) "the Senior Accounting Associate had taken an advance of $2,600" that Yazzie wrote off without authority and without informing Van Pelt. Dkt. 30-1 at 4 (Defs. SUMF ¶¶ 27–36). Notably, it was Van Pelt—rather than independent investigation—that

"brought to [the auditors'] attention . . . that there was an instance where [Yazzie] was reimbursed twice . . . for an airline ticket." *See* Dkt. 30-3 at 131.

Yazzie denies that she did anything improper. With respect to the allegation that she was reimbursed twice for some expenses, Yazzie contends that she "was unaware that . . . Imhoff had . . . submitted" a (duplicative) request for reimbursement on her behalf. Dkt. 33-3 at 4 (Pl. Resp. to Defs. Fact 27). With respect to the rent payment, Yazzie explains that she used the NOW credit card "to make a security deposit on an apartment as part of her relocation to Washington D.C.," which, on her telling, "was a moving expense, for which incoming NOW Officers are permitted." *Id.* As to the expense reports and petty cash checks, Yazzie says she signed them only "when Van Pelt was not present in Washington D.C." Dkt. 33-3 at 5, 6 (Pl. Resp. to Defs. Fact 29, 30). Yazzie also declares that all accounting errors "were immediately corrected and no nefarious or intentional misconduct was identified." Dkt. 33-1 at 6 (Yazzie Decl. ¶ 9). Finally, Yazzie attests that she "did not authorize an advance of $2,600 or any amount to the Senior Accounting Associate." Dkt. 33-1 at 6 (Yazzie Decl. ¶ 11). Rather, she explains, the "advance was made [when Terry O'Neill was President of NOW,] and at no time was I instructed to do anything related to that advance." *Id.*

In May 2018, Van Pelt promoted Lisa Seigel to Chief of Staff and assigned Seigel responsibility for "onboarding new employees, managing employee benefits[,] and training the new 'Chapter Specialist.'" Dkt. 33-1 at 9 (Yazzie Decl. ¶ 21). According to Yazzie, "[a]ll of these duties, including the oversight of chapter and member relations, were, as provided by the bylaws and prior practice, [her] responsibility as Vice President." *Id.* Lisa Seigel is not Native American. Dkt. 33-4 at 5 (Pl. SUMF ¶ 16). On May 3, 2018, Van Pelt issued a press release that included that the term "Redskins." Dkt. 33-1 at 9 (Yazzie Decl. ¶ 22). Yazzie was not consulted

before the press release was issued, and she later complained to the National Board that she had

not been consulted and about the use of "this racist language against Native Americans." *Id.*

Defendants do not deny that the press release included this language. *See* Dkt. 34-3 at 5 (Defs.

Resp. to Pl. Fact 14).

On May 21, 2018, Van Pelt, National Board member Beth Corbin, and NOW attorney

Tom Hart asked Yazzie to resign based on purported "financial irregularities," and they offered

her a "cash settlement" as inducement.  Dkt. 33-4 at 8 (Pl. SUMF ¶ 35).  Yazzie "refused to sign

the resignation at that time" but "was given two weeks to review the paperwork." *Id.* at 9 (Pl.

SUMF ¶ 36).  At the end of the meeting, she was "escorted out of the office." *Id.*  In addition,

"[i]mmediately after [the] meeting[,] the locks to the office were changed and [Yazzie] was not

given a key," and "Yazzie was locked out her NOW e-mail account." *Id.* (Pl. SUMF ¶ 37).

According to Yazzie (although disputed by Defendants), Van Pelt then used Yazzie's email

account to send an email to NOW staff and National Board members "falsely represent[ing] that

[Yazzie] was voluntarily taking a personal leave." *Id.*; Dkt. 34-3 at 11 (Def. Resp. to Pl. Fact

37).  "On June 1, 2018, Yazzie told Board [m]ember Cindy Drabek that she was not resigning;"

she "remained," however, "locked out of the office."  Dkt. 33-4 at 9 (Pl. SUMF ¶ 38).

The National Board met in an emergency meeting on June 10, 2018.  In advance of that

meeting, one Board member, MonaLisa Wallace, sent an email to the other Board members,

asserting that a "vote to fire" Yazzie would contribute "to a hostile workplace" and that Yazzie

was being "[s]capegoat[ed]."  Dkt. 30-3 at 163–65.  A group of former NOW employees, all of

whom resigned earlier that year, also sent the Board a "submission" in advance of the June 10

meeting.  Dkt. 33-1 at 39; *id.* at 42 (Imhoff Decl. Ex. 1).  Going a step beyond the Wallace email,

they asked the Board to give "serious consideration" to removing Van Pelt from office and, in

any event, urged the Board to conduct a "serious appraisal of [Van Pelt's] leadership since she began her term in August 2017." Dkt. 33-1 at 42 (Imhoff Decl. Ex. 1).  Of relevance here, they accused Van Pelt of creating "a hostile work environment for fellow officers, employees, contractors, and interns;" "[p]hysically, verbally, and emotionally threaten[ing] staff members;" and "[a]ttempt[ing] to incorporate her own personal bias[es] into NOW work[,] including" racial bias.  *Id.*  In detailing Van Pelt's alleged misdeeds, the letter asserted that Van Pelt has "physically intimidated . . . Yazzie," stripped her of "her responsibilities as Vice President," "referred to [Yazzie] as 'weird'" shortly after she and Yazzie "took office," told NOW staff that "she chose [Yazzie] as her running mate because she needed 'a woman of color,'" "made no real effort to bring [Yazzie] into the fold," and "d[id] everything in her power to make [Yazzie's] work experience miserable, including slowly removing all of [Yazzie's] work responsibilities." *Id.* at 44, 46 (Imhoff Decl. Ex. 1).  Although it is unlikely that the letter itself is admissible for the truth of these assertions, *see* Fed. R. Civ. P. 56(c); Fed. R. Evid. 802, it is appended to a declaration offered by one of the signatories, and that declaration attests under the penalty of perjury that the signatory personally "witnessed . . . Van Pelt freeze . . . Yazzie out of the administration," "witnessed . . . Van Pelt yelling loudly at and physically intimidating . . . Yazzie," and "witnessed . . . Van Pelt belittle . . . Yazzie . . . and other women of color."  Dkt. 33-1 at 39 (Imhoff Decl. ¶¶ 3-4).

At the June 10 meeting, the National Board voted on whether to remove Yazzie from her role as Vice President.  Dkt. 30-1 at 5 (Defs. SUMF ¶ 38).  That vote came up short.  As a result, Yazzie retained her position, Dkt. 30-1 at 6 (Defs. SUMF ¶ 39), and she was once again granted access to the national office.  At her deposition, Van Pelt explained this turn of events as follows:

Q.      Well, she was locked out in June 2018, at your order . . . .

A.      When they didn't fire her, I had to give her access again for that short
period of time, and I did.

Dkt. 33-2 at 17 (Van Pelt Dep. at 183); *see also* Dkt. 33-1 at 11 (Yazzie Decl. ¶ 28).

A month later, on July 5, 2018, the National Board met again in an executive session.
When attention turned to Yazzie, Wallace moved (1) to change the job description for the Vice
President, so that Yazzie would engage in field organizing and would not be physically present at
the national office, (2) to give the Vice President "a $50,000 annual discretionary budget for
travel, software, or other expenses of her work," (3) to permit the Vice President to use the NOW
credit card to pay those expenses, (4) to grant her "access to the national office staff," (5) to
permit her "to participate in all typical staff meetings by conference call[,]" and, finally, (6) to
require "the national officers be trained in nonviolent communication skills."  Dkt. 30-3 at 160
(Defs. Ex. 11).  The meeting minutes are unclear as to whether the Board approved this motion,
but it is clear that the Board decided to create a three-person committee to oversee the
restructuring of the Vice President's work and "serve as a transparent conduit for communication
between the" President and the Vice President.  Dkt. 30-3 at 172 (Defs. Ex. 13).  Until this
committee (which eventually became known as the "Vice-President Oversight Committee") was
able to meet, the Board authorized Yazzie to work in the field.  Dkt. 30-3 at 160 (Def. Ex. 11).
In Yazzie's view, this action was far from an accommodation.  As she characterizes the action,
"[w]hat the Board actually did was to require [her] to work from the field, with no budget, no
administrative support, [and] she was banned from speaking with NOW employees, . . . banned
from entering the NOW office, . . . had to submit to close oversight by an Oversight Committee,
[and] had to get permission for everything she did and [had] to provide reports."   Dkt. 33-3 at 8
(Pl. Resp. to Defs. Fact 40); *see also* Dkt. 33-4 at 11 (Pl. SUMF ¶ 44).

Adding gas to the fire, Van Pelt told the Board in July 2018 that she would not sign Yazzie's paycheck.  Van Pelt testified at her deposition (with a touch of sarcasm) that she refused to do so "because people normally get paid for working."  Dkt. 33-2 at 18 (Van Pelt Dep. at 220).  The Oversight Committee, which Defendants characterize as necessary "[t]o monitor . . . Yazzie's work," Dkt. 30-1 at 6 (Defs. SUMF ¶ 41), and which Yazzie contends was necessary to ensure that she was paid, *see* Dkt. 33-4 at 10–11 (Pl. SUMF ¶ 43), consisted of one National Board member chosen by Yazzie, one chosen by Van Pelt, and one chosen by the two other committee members, *see* Dkt. 30-1 at 6 (Defs. SUMF ¶ 42).  The Oversight Committee established written goals for Yazzie's new role, including "chapter development work . . . and coordination."  *Id.* (Defs. SUMF ¶ 47).  Although the Oversight Committee "instructed . . . Yazzie to submit biweekly payroll time sheets with itemized field reports, expense reporting logs, and other related paperwork, . . . [w]ithin the first month of" the committee's existence, it "had to meet with her because of late or missing reports and delayed responses to emails while working remotely."  Dkt. 30-1 at 7 (Defs. SUMF ¶¶ 48–49).

On November 11, 2018, National Board member John Erikson forwarded an email to Yazzie, which "regard[ed] allegations [about Van Pelt made] by a recently discharged African American employee (Brittany Oliver) and [Van Pelt's] response . . . to Erikson's complaint."  Dkt. 33-4 at 12 (Pl. SUMF ¶ 49); Dkt. 33-1 at 29 (Yazzie Decl. Ex. D).  Attached to the email was the following tweet that Oliver had posted in October:

> What does racism and white supremacy look like under the Trump administration?  On Tue. October 9 at 11:30 am, I was pulled into a work meeting that was started off with "I'm concerned that you only care about black women & not ALL women" by the president of a "feminist" organization.

Dkt. 33-1 at 31 (Yazzie Decl. Ex. D).  Two days later, "Yazzie sent an email to Oversight Committee Member Nancy Campbell Mead complaining of mistreatment received by two

former African American employees, Brittany Oliver and Sparkle Barrett." Dkt. 33-4 at 13 (Pl. SUMF ¶ 51). According to Yazzie, after she sent that email, "access to [her] NOW email account was suspended," and she could no longer "send or receive emails from that account." Dkt. 33-1 at 15 (Yazzie Decl. ¶ 36). On January 2, 2019, "Van Pelt announced in a staff meeting that [Yazzie] was to immediately cease publicly representing NOW on the issue of the Equal Rights Amendment[, . . .] would have to cancel an upcoming United Nation's panel talk invitation[, and . . . ] could no longer speak on behalf of NOW without her direct prior approval." Dkt. 33-4 at 14 (Pl. SUMF ¶ 55).

In late January 2019, the "Oversight Committee reported to the National Board major concerns with the lack of communication between Ms. Yazzie and the Committee." Dkt. 30-1 at 7 (Defs. SUMF ¶ 50); *see also* Dkt. 30-3 at 172–75 (VP Oversight Committee Report). As a result, NOW hired a human resources consultant, Andrea Grayson, to work with Yazzie. Dkt. 30-1 at 7 (Defs. SUMF ¶ 54). On April 24, 2018, Grayson provided a report to the National Board in which she stated that "Yazzie did 'not routinely respond to emails and texts in a timely manner' and '[did] not follow policies and procedures as established by the NOW organization.'" Dkt. 30-1 at 7–8 (Defs. SUMF ¶¶ 55-56). Grayson further reported that "Yazzie did not have solid organizational skills, did not communicate effectively regarding her availability, and was noncompliant with requests," "had stated that she did not agree with the [o]rganization's priorities and directives and continued to view her role in a different light than how it was defined by the [o]rganization," and "appeared to be uncomfortable and overwhelmed by the Vice President job duties." Dkt. 30-1 at 8 (Defs. SUMF ¶¶ 57–59).

The National Board met on May 6, 2019, and Board member Cynthia Drabek (who is a defendant in this action) moved to remove Yazzie "on the ground that her conduct as Vice

President has been contrary to the principles and purposes of NOW and injurious to the [o]rganization."  Dkt. 30-3 at 240.  The motion was carried by a supermajority of the Board, and Yazzie was removed from her role as NOW's Vice President.  *Id.*  After Yazzie was removed, Christian Nunes, who "identifies as African American," Dkt. 33-4 at 5 (Pl. SUMF ¶ 18), became Vice President, *id.* (Pl. SUMF ¶ 19).  Van Pelt remained President.  *Id.*

**B.      Procedural Background**

Yazzie brought this suit against NOW, Toni Van Pelt, Cynthia Drabek, and Beth Corbin in D.C. Superior Court, Dkt. 1-3 at 1, and Defendants removed the action to this Court pursuant to 28 U.S.C. §§ 1331, 1441, and 1446, Dkt. 1 at 1.  Her complaint originally included nine counts: claims against NOW under Title VII of the Civil Rights Act of 1964 for race discrimination (Count I), hostile work environment (Count II), and retaliation (Count III); claims against NOW under 42 U.S.C. § 1981 for race discrimination (Count IV), hostile work environment (Count V), and retaliation (Count VI); state-law claims against NOW and Van Pelt for assault (Count VII) and battery (VIII); and a state-law claim for defamation against all Defendants (Count IX).  Dkt. 1-3 at 21–37 (Compl. ¶¶ 63–136).  On March 30, 2021, the Court granted Defendants' Motion to Dismiss Counts VII (assault) and VIII (battery) and denied Defendants' Motion to Dismiss the remaining counts.  Dkt. 17.

After the close of discovery and a pre-motion conference, Defendants filed the pending motion summary judgment on the remaining claims (Counts I–VI and IX), Dkt. 30, and Yazzie opposed that motion, Dkt. 33.

## II.  LEGAL STANDARD

To prevail on a motion for summary judgment, the moving party bears the burden of demonstrating "that there is no genuine dispute as to any material fact and [that it] is entitled to

judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986); *Holcomb v. Powell*, 433 F.3d 889, 895–96 (D.C. Cir. 2006).  A fact is "material" if it is capable of affecting the outcome of the litigation.  *Holcomb*, 433 F.3d at 895; *Liberty Lobby*, 477 U.S. at 248.  A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *See Scott v. Harris*, 550 U.S. 372, 380 (2007); *Liberty Lobby*, 477 U.S. at 248; *Holcomb*, 433 F.3d at 895.

In considering a motion for summary judgment, the Court must resolve all factual disputes and draw "all justifiable inferences" in favor of the non-moving party.  *Liberty Lobby*, 477 U.S. at 255; *see also Mastro v. Pepco*, 447 F.3d 843, 850 (D.C. Cir. 2006).  But the non-moving party's opposition must consist of more than mere allegations or denials; instead, it must be supported by affidavits, declarations, or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  "[T]he moving party is entitled to judgment as a matter of law if the non-moving party 'fails to make a showing sufficient to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial.'"  *Eddington v. United States Dep't of Def.*, 35 F.4th 833, 836–37 (D.C. Cir. 2022).  When "determining a motion for summary judgment, the Court may assume that facts identified by the moving party in its statement of material facts are admitted, unless such a fact is controverted in the statement of genuine issues filed in opposition to the motion."  Local Civ. R. 7(h).

## III.  ANALYSIS

### A.    Title VII "Employer"

Yazzie brings her first three claims against NOW (race discrimination, hostile work environment, and retaliation) under Title VII.  It is an "unlawful employment practice" under

Title VII "for an employer" to discriminate against an individual "because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e-2, or "because [s]he has opposed any practice made an unlawful employment practice by" Title VII, id. § 2000e-3.  Notably, both subsections apply only to actions taken by an "employer."  An "employer," for purposes of Title VII, is an individual, government agency, labor union, partnership, association, corporation, or similar entity that is "engaged in an industry affecting commerce who has fifteen or more employees for each working day in each of twenty or more calendar weeks in the current or preceding year."  42 U.S.C. § 2000e(a) & (b).  As a threshold defense, NOW contends that it did not employ fifteen or more people for twenty weeks preceding the alleged discriminatory conduct and that, accordingly, Yazzie's Title VII claims fail as a matter of law.  Dkt. 30-2 at 18.

When NOW raised the same defense at the motion to dismiss stage, the Court declined to resolve the issue because applying the governing standard requires a fact-intensive inquiry not typically amenable to resolution of a motion to dismiss, and because, "even if the Court were to construe Defendants' motion as one for summary judgment, they [had] not carried their burden of 'show[ing] that there [was] no genuine dispute as to any material fact.'"  Dkt. 17 at 14–15.  With the benefit of a more complete factual record and the different standard that applies at the summary judgment stage, NOW renews this defense.  But even with those advantages, NOW has still failed to carry its burden.

To determine whether an employer "has" an employee for a given "working day," the Supreme Court has endorsed the "payroll method," which takes its name from the fact that "the employment relationship is most readily demonstrated by the individual's appearance on the employer's payroll."  *Walters v. Metro. Educ. Enters., Inc.*, 519 U.S. 202, 206 (1997).  Under this approach, an employer "has" an employee for any day on which an "employment

relationship" exists, regardless of whether the employee works or receives compensation on that day. *Id.* at 206–07. As the Supreme Court explained in *Walters*, this method "represents the fair reading of the statutory language, which sets as the criterion the number of employees that the employer 'has' for each working day," and, "[i]n common parlance, an employer 'has' an employee if he maintains an employment relationship with that individual." *Id.* at 207.

In support of its motion for summary judgment, NOW offers the declaration of Bear Atwood, who has served as NOW's Vice President since October 2020 and who, in that capacity, has access to NOW's payroll records. Dkt. 30-5 at 2 (Atwood Decl. ¶¶ 1–2). Atwood attests that she has "reviewed [NOW's] payroll records for each two-week payroll period from January 2017 through May 2019" and that she found that "NOW never employed fifteen or more employees during any two-week payroll period." (Atwood Decl. ¶¶ 3–4). The period of time covered by Atwood's declaration, moreover, includes any and all periods even arguably relevant for present purposes, since Yazzie's employment did not commence until July 2017—more than twenty weeks after January 2017, when Atwood's analysis begins—and was terminated in May 2019—when Atwood's analysis ends.

The problem that NOW faces is that portions of Atwood's Declaration are inconsistent with the records that NOW has produced. When Defendants first submitted their payroll records, the records—contrary to Defendants' representations—did not contain the records for all pay periods from January 2017 through May 2019. *See* Dkt. 30-5 at 3; Dkt. 32. The Court, accordingly, ordered Defendants to provide it with complete payroll for that entire time period. Min. Order (Dec. 13, 2023). To the Court's surprise, Defendants' supplemental submission not only showed that NOW employed fifteen or more employees from April 3, 2017, to May 28, 2017, but the records were also still incomplete—missing records for the period of May 29,

2017, to August 20, 2017.  If the missing period maintained the same employment as the period immediately prior, NOW would have employed fifteen or more employees for twenty weeks of 2017.

Yazzie's own efforts to controvert the central premise of NOW's argument leave many gaps too.  For support, Yazzie points to her own declaration, which lists twenty-two individuals, who she claims were paid employees during "the first consecutive weeks of [her] employment for NOW beginning in July of 2017.  Dkt. 33-1 at 18–21 (Yazzie Decl. ¶ 43).  And she points to Emily Imhoff's declaration, which identifies nineteen individuals who, Imhoff asserts, "were regularly paid staff during the last two consecutive weeks of July 2017."  Dkt. 33-1 at 39 (Imhoff Decl. ¶ 5).  According to Yazzie's own evidence, however, three of the individuals listed by both her and Imhoff (M.E. Ficarra, Joya Taft-Dick, and Angela Abadir) resigned between August and November 2017; Dkt. 33-1 at 43–44 (Imhoff Decl. Ex. 1); the employment of the outgoing President and Vice President (Terry O'Neill and Bonnie Grabenhofer) ended July 31, 2017; Dkt. 34-3 at 20 (Van Pelt Dep. at 62); Dkt. 16-1 at 4–5; and three individuals (William Klein, Pat Reuss, and Dorothy Demerest) who Yazzie lists as employees never appear on NOW's employee payroll.  *Compare* Dkt. 33-1 at 43, *with* Dkt. 35.

Given this uncertainty, the Court cannot grant summary judgment to NOW on the theory that it was not, at the relevant time, an employer under Title VII; simply put, although Yazzie carries the burden of proving that NOW was employer, NOW is the party that has access to the relevant evidence, and it has failed to carry its burden of showing there is no genuine issue of fact on the question.  The evidence offered leaves much to be resolved, but that fact-finding will now fall to the jury, not the Court.

**B.      Race Discrimination under Title VII and Section 1981**

Title VII and section 1981 both protect employees against racial discrimination.  Under

Title VII, it is "an unlawful employment practice for an employer . . . "

> to fail or refuse to hire or to discharge any individual, or otherwise to
> discriminate against any individual with respect to his compensation, terms,
> conditions, or privileges of employment, because of such individual's race,
> color, religion, sex, or national origin[.]

42 U.S.C. § 2000e-2(a)(1).  Under section 1981:

> All persons within the jurisdiction of the United States shall have the same right
> in every State and Territory to make and enforce contracts, to sue, be parties,
> give evidence, and to the full and equal benefit of all laws and proceedings for
> the security of persons and property as is enjoyed by white citizens, and shall be
> subject to like punishment, pains, penalties, taxes, licenses, and exactions of
> every kind, and to no other.

42 U.S.C. § 1981(a).  The phrase "make and enforce contracts" is further defined to include "the

enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship."  *Id.*

§ 1981(b).

To prevail on a section 1981 disparate treatment claim asserting discrimination in

employment, the plaintiff must show that "the employer intentionally discriminated against the

employee on the basis of race."  *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013).

The plaintiff's burden is "ultimately [to] prove that, but for race, it would not have suffered the

loss of a legally protected right."  *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 140

S. Ct. 1009, 1019 (2020).  Although this but-for test is, at least at times, more demanding than

the motivating-factor test that applies in Title VII cases, courts use the same general framework

for evaluating section 1981 and Title VII cases at the summary judgment stage.  *See Ayissi-Etoh*,

712 F.3d at 576.  A plaintiff can carry her initial burden either by offering sufficient *direct*

evidence of discrimination to permit a reasonable jury to find that the plaintiff's race was the but-

for cause or motivating factor of the alleged adverse employment action.  *Id.*  Or, if "there is no direct evidence of discriminatory intent—that is, no 'statement that itself shows racial . . . bias in the [employment] decision,'" *id.*, the plaintiff can make out a prima facie claim of discrimination "by establishing that: (1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination," *Stella v. Mineta*, 284 F.3d 135, 145 (D.C. Cir. 2002) (internal quotation marks and citation omitted).

If the plaintiff does so, then the burden shifts to the employer to "articulate some legitimate, nondiscriminatory reason for the employee's [actions]."  *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).  But that does not end the shifting of burdens.  Under the D.C. Circuit's decision in *Brady v. Office of the Sergeant of Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008), once an employer proffers "a legitimate, non-discriminatory reason for the decision, the district court need not—*and should not*—decide whether the plaintiff actually made out a prima facie case under *McDonnell Douglas*."  Instead, "in considering an employer's motion for summary judgment . . . , the district court must resolve one central question: Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the employee on the basis of race . . . ."  *Id.*  At this third step, "a plaintiff can show discrimination 'either directly by persuading the [factfinder] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'"  *George v. Leavitt*, 407 F.3d 405, 413 (D.C. Cir. 2005) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256 (1981) (alteration in original)).

Finally, the D.C. Circuit has more recently emphasized that "the *Brady* shortcut applies only if the parties properly move past the second step." *Figueroa v. Pompeo*, 923 F.3d 1078, 1087 (D.C. Cir. 2019). "In particular, before concluding that the employer has carried its burden under the second prong, the Court must consider (1) whether the employer has 'produce[d] evidence that a factfinder may consider at trial (or a summary judgment proceeding);' (2) whether that evidence is sufficient to permit a reasonable jury 'to find that "the employer's action was motivated by" a non-discriminatory reason;' (3) whether the proffered, non-discriminatory reason is 'facially "credible" in light of the proffered evidence;' and (4) whether the evidence 'present[s] a "clear and reasonably specific explanation."'" *Kirkland v. McAleenan*, 2019 WL 7067046, at *14 (D.D.C. Dec. 23, 2019) (quoting *Figueroa*, 923 F.3d at 1087).

## 1.

The first question that the Court must consider under either approach is whether Yazzie has offered sufficient evidence to permit a reasonable jury to find that she suffered some adverse employment action. That is—to return to the text of section 1981 and Title VII—that she was denied "the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," 42 U.S.C. § 1981(b), or was discriminated against in the "compensation, terms, conditions, or privileges of employment," 42 U.S.C. § 2000e-2(a)(1). Here, Yazzie maintains that she suffered three adverse employment actions: (1) a suspension when she was locked out of the office from May 21, 2018 to June 10, 2018; (2) a demotion in July 2018 when her power was stripped and her responsibilities were reassigned to another; and (3) her removal on May 6, 2019. Dkt. 33 at 27–29. In Defendants' view, only the last of these—Yazzie's removal on May 6, 2019—rises to the level of an adverse employment action. The Court is unpersuaded.

Defendants first argue that being locked out of the office from May 21, 2018, to June 10, 2018, does not constitute an adverse action because, unlike cases of lengthy suspensions, *cf.* *Richardson v. Petasis*, 160 F. Supp. 3d 88, 117–18 (D.D.C. 2015), Yazzie was not relieved of any job duties.  Dkt. 34 at 16.  According to Defendants, "'[p]urely subjective injuries, such as dissatisfaction with a reassignment[,] . . . are not adverse actions.'"  *Id.* at 14–15 (quoting *Forkkio v. Powell*, 306 F.3d 1127, 1130–31 (D.C. Cir. 2002)).  As an initial matter, the Court notes that it is far from clear that that Defendants invoke the correct standard.  The case that they cite, *Forkkio v. Powell*, is a Title VII case that applied the "objectively tangible harm" standard established in *Brown v. Brody*, 199 F.3d 446 (D.C. Cir. 1999).  *See Forkkio*, 306 F.3d at 1130–31 (citing *Brown*, 199 F.3d at 457).  The en banc D.C. Circuit, however, overruled *Brown* in *Chambers v. District of Columbia*, 35 F.4th 870 (D.C. Cir. 2022), and replaced the "objectively tangible harm" standard with a renewed focus on the text of Title VII—all that is now required is discrimination with respect to an employee's "terms, conditions, or privileges of employment," *id.* at 872, 873–75 (quoting 42 U.S.C. § 2000e-2(a)(1)).  And, as the D.C. Circuit emphasized in *Chambers*, that is a "capacious" standard that "evince[s] a[] [congressional] intent to strike at the entire spectrum of disparate treatment . . . in employment."  *Id.* at 874 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 64 (1986)).

Because *Chambers* was a Title VII case, the question remains whether it extends to claims brought under section 1981.  The parties have not briefed that question, and, accordingly, the Court will avoid reaching a definitive view.  For now, the Court will simply note that there appear to be good reason to believe that the *Chambers* standard applies in section 1981 employment discrimination cases.  Among other things, the D.C. Circuit and this Court have "use[d] the same framework for determining whether unlawful discrimination [has] occurred"

for purposes of Title VII and section 1981.  *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 576 (D.C. Cir. 2013); *see also Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004); *Joyner v. Morrison & Forrester LLP*, 2023 WL 6313194, at *4 (D.D.C. Sept. 27, 2023).  And, even more to the point, "*Chambers* rested on textual grounds, namely, a determination of what the words 'terms, conditions, or privileges of employment' mean," *Bain v. Off. of the Att'y Gen.*, 648 F. Supp. 3d 19, 51 (D.D.C. 2022), and, in relevant respects, the text of section 1981 is indistinguishable:  Title VII prohibits discrimination "with respect to . . . compensation" and the "terms, conditions, or privileges of employment," 42 U.S.C. § 2000e-2(a)(1), while section 1981 makes it unlawful to discriminate in the making or enforcement of a contract—including in "the enjoyment of all benefits, privileges, terms, and conditions of" an employment contract, 42 U.S.C. § 1981(b).  Absent some argument to contrary, the Court will assume for now, without definitively deciding, that the "judicial gloss" that the D.C. Circuit adopted in its now-defunct decision in *Brown v. Brody* should control here.  *Bain*, 648 F. Supp. 3d at 50.

Because *Chambers* is a relatively recent development in the law,[1] there is little precedent to guide the Court in applying the post-*Brown v. Brody* standard.  The D.C. Circuit has opined, however, that the text of Title VII is "capacious," that it "evince[s] a[n] . . . intent to strike at the entire spectrum of disparate treatment . . . in employment," and that the Court must be guided by the statutory text.  *Chambers,* 35 F.4th at 874 (first alteration added) (quoting *Meritor Sav. Bank,*

---

[1]  It is unclear, moreover, whether the law will continue to evolve on this issue.  Most notably, the Supreme Court recently granted certiorari in *Muldrow v. City of St. Louis*, which raises the question whether "Title VII prohibit[s] discrimination in transfer decisions absent a separate court determination that the transfer decision caused a significant disadvantage?"  143 S. Ct. 2686 (2023).  The petition for certiorari highlighted the circuit split between the D.C. Circuit's decision in *Chambers* (and similar decisions by the Sixth and Ninth Circuit) and decisions from the Third, Fifth, and Eighth Circuits (which require proof of material disadvantage).  Pending a decision in that case, of course, this Court remains bound by the D.C. Circuit's en banc decision in *Chambers*.

*FSB v. Vinson*, 477 U.S. 57, 64 (1986)).  At least in relevant respects, moreover, same is true of section 1981.  Considered in this light, the Court is unpersuaded that Defendants have carried their burden of showing that no reasonable jury could find that locking Yazzie out of the national office from May 21, 2018, to June 10, 2018, constituted an adverse employment action.  A reasonable jury could find that, by doing so, Van Pelt deprived Yazzie of the "enjoyment of" a "benefit" or "privilege" of her employment contract, 42 U.S.C. § 1981(b), and discriminated against her in the "compensation, terms, conditions, or privileges of employment," 42 U.S.C. § 2000e-2(a)(1).  It could also find that Van Pelt effectively deprived Yazzie of her contractual right to serve as Vice President of a national organization for almost three weeks, deprived her of the use of an office and access to the national staff, and fundamentally altered the terms of her employment.  That is all that is required for present purposes.

The same conclusion applies with even greater force with respect to Yazzie's second asserted adverse action—her alleged loss of authority and effective demotion in July 2018, when she was stripped of important responsibilities that were then reassigned to another NOW employee.  Yazzie alleges that she was stripped of the usual duties of Vice President and was left "with no office, n[o] budget, no administrative staff, no interaction with NOW Office staff[,] and close, more stringent supervision."  Dkt. 33 at 28 (Pl. Opp. to MSJ).  Although NOW objects to that characterization, it agrees that on July 5, 2018, the "National Board modified the duties required of Ms. Yazzie by directing that she work in the field to work on the creation of new chapters and work with existing ones."  Dkt. 30-1 at 6 (Defs. SUMF ¶ 40); *see also* Dkt. 34-3 at 5 (Defs. Resp. to Pl. Fact 16).

As this Court has previously observed:

Under the pre-*Chambers* regime, "changes in assignments and work-related duties d[id] not ordinarily constitute adverse employment decisions if

> unaccompanied by a decrease in salary or work hour changes." *Mungin v. Katten Muchin & Zavis*, 116 F.3d 1549, 1557 (D.C. Cir. 1997). But *Chambers* rejected that notion, holding that the "unadorned wording" of Title VII "admits of no distinction between 'economic' and 'non-economic' discrimination or 'tangible' and 'intangible' discrimination," nor does it give a free pass to discrimination that might be considered "garden variety." 35 F.4th at 874.

*Bain*, 648 F. Supp. 3d at 56. To be sure, even under *Chambers*, not all changes in work assignments necessarily constitute adverse actions, *id.*, but a jury could reasonably find that stripping the Vice President of an organization of the duties normally associated with that post, and replacing those national responsibilities with duties as a field organizer, suffices. Indeed, even under the pre-*Chambers* standard, "'reassignment with significantly different responsibilities,' even without any reduction in pay or benefits or other direct economic loss," . . . or "loss or diminution of supervisory or programmatic duties" was, at least at times, sufficient to satisfy the adverse-employment-action requirement. *Espinosa v. Donovan*, 2015 WL 4249276, at *3 (D.D.C. July 13, 2015) (first quoting *Forkkio*, 306 F.3d at 1131; then citing *Czekalski v. Peters*, 475 F.3d 360, 364–65 (D.C. Cir. 2007)); *see also Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006) ("Holcomb never suffered a reduction in grade, pay, or benefits . . . . She did, however, experience an extraordinary reduction in responsibilities that persisted for years."). Under the *Chambers* standard and the plain language of section 1981, Yazzie's loss of important duties clears the adverse-employment-action hurdle.

### 2.

The Court must next consider whether there is sufficient direct evidence to permit a reasonable jury to find in her favor that any of the asserted adverse actions were taken because of Yazzie's race. If so, the Court's inquiry regarding Yazzie's section 1981 and Title VII claims can end there.

In an effort to make this showing, Yazzie points to the evidence that on January 29, 2018, Van Pelt used a racial term—calling Yazzie "You P.O.C.," an acronym for "person of color," and then, arguably, tied the use of that racial term to Yazzie's employment by yelling, "You won't be here for three years."  Dkt. 33-4 at 7 (Pl. SUMF ¶¶ 28–30) (internal quotation marks omitted).  Yazzie contends that this was "a threat which Van Pelt persisted in attempting to effectuate from May 21, 2018, until she succeeded May 5, 2019."  Dkt. 33 at 25.  Defendants, in turn, dispute that Van Pelt made those statements.  Dkt. 34-3 at 9 (Defs. Resp. to Pl. Fact 30).  And they argue that, even if she did so, Yazzie's argument would fail because it was the Board, not Van Pelt, that decided to change Yazzie's job requirements and ultimately decided to terminate her employment.  Dkt. 34 at 14.

For different reasons and although the question is a close one, the Court is unpersuaded that, even if Van Pelt made the statements that Yazzie attributes to her, those statements would qualify as direct evidence of discrimination.  The use of a racial epithet, particularly during the same interaction in which the speaker threatens to cut the plaintiff's employment short, might well constitute significant, circumstantial evidence of racial bias.  But there is a difference between telling a person that she will be fired because of her race and forecasting that someone will not last three years in a job, while using a racial epithet.  In one case, no inference is required and, in the other, some illation (even if arguably straightforward) is needed.  Here, moreover, the nexus is further attenuated by the temporal gap between Van Pelt's alleged invocation of race in January 2018 and the first adverse employment action that Yazzie asserts, which did not occur until late May 2018.  And, with respect to at least two of the three asserted adverse employment actions, it is attenuated even further by the fact that it was the National Board—and not Van Pelt—that redefined Yazzie's duties as Vice President and ultimately

terminated her employment.  To be sure, under Yazzie's theory of the case, Van Pelt influenced

the Board in making those decisions, and she allegedly did so due to racial animus.  But, even

accepting that theory, the Court cannot conclude that Van Pelt's alleged use of a racial epithet in

January 2018 constitutes *direct* evidence that the Board limited Yazzie's duties and terminated

her because of her race.

For all of these reasons, this case is unlike *Ayissi-Etoh*, 712 F.3d at 576–77, which Yazzie

invokes to argue that her disparate treatment claim is supported by sufficient direct evidence of

discriminatory motive to withstand Defendants' motion for summary judgment.   Here, the

statement was made months before any of the alleged adverse actions occurred.  In addition,

although the parties provide little detail about what provoked the interchange, Yazzie has failed

to draw a direct link between the alleged, racially offensive statement and the prediction that she

would not be at NOW three years from then, especially given that Van Pelt lacked authority to

individually re-define Yazzie's duties or to terminate her employment.  *Cf. Coats v. DeVos*, 232

F. Supp. 3d 81, 86–88 (D.D.C. 2017) (when asked why he was continuing the removal process,

supervisor allegedly responded, "Frankly, Ron, it's because of your race and salary"); *see also*

*Said v. Nat'l R.R. Passenger Corp.*, 317 F. Supp. 3d 304, 322 (D.D.C. 2018), *amended on*

*reconsideration*, 390 F. Supp. 3d 46 (D.D.C. 2019), *aff'd*, 815 F. App'x 561 (D.C. Cir. 2020)

(statements are indirect not direct evidence when they require an inference); *Conn v. Am. Nat'l*

*Red Cross*, 149 F. Supp. 3d 136, 146 (D.D.C. 2016) (statements are indirect not direct evidence

when they arise in a different context months prior).

This, of course, does not mean that Van Pelt's alleged, racially offensive statements are

irrelevant.  To the contrary, even if they do not constitute direct evidence that NOW acted for

racially discriminatory reasons, if believed, they constitute "probative evidence" of Van Pelt's

allegedly "discriminatory attitude." *Morris v. McCarthy*, 825 F.3d 658, 670 (D.C. Cir. 2016). The Court will, accordingly, "consider [this evidence] alongside any additional statements—and all other evidence—to determine whether [Yazzie] has met her burden" of showing that the circumstantial evidence suffices to avoid summary judgment. *Id.*

### 3.

As explained above, courts use the three-step *McDonnell Douglas* framework to evaluate circumstantial evidence of discrimination under section 1981 and Title VII. *Brown v. Sessoms*, 774 F.3d 1016, 1022 (D.C. Cir. 2014). But once the employer proffers a legitimate, non-discriminatory reason for its action, the court must determine whether the employee has offered sufficient evidence to permit a reasonable jury to find that the asserted reason is pretextual and that the actual reason was discriminatory. *Brady*, 520 F.3d at 494. In proffering a legitimate, non-discriminatory reason, however, the employer must offer more than a conclusory assertion that it did not act based on race; it must "proffer admissible evidence showing a legitimate, nondiscriminatory, clear, and reasonably specific explanation for its actions." *Figueroa*, 923 F.3d at 1087. As to each of the asserted adverse employment actions, the Court must therefore consider whether NOW has carried its burden of proffering evidence showing a "clear" and "reasonably specific" non-discriminatory reason for its actions and, if so, whether Yazzie has carried her burden of proffering evidence of pretext and discrimination.

### Exclusion from Office and Changed Responsibilities

The first two adverse actions that Yazzie identifies—Van Pelt's decision in May 2018 to lock her out of the office and the Board's decision in July 2018 to modify her duties—turn on the same asserted non-discriminatory rationale, and are thus best addressed together. As to both,

28

NOW posits that it acted out of concern about financial mismanagement, as detailed in a May 19, 2018, audit report.  *See* Dkt. 30-2 at 12–13; *see also* Dkt. 30-1 at 4–6 (Defs. SUMF ¶¶ 24–40).

Defendants' showing satisfies *Figueroa*'s requirement that the employer proffer evidence of a "clear" and "reasonably specific" non-discriminatory reason for acting.  *Figueroa*, 923 F.3d at 1087.  Defendants point, in particular, to several alleged financial concerns: (1) Yazzie was "reimbursed twice for a $465 airline ticket," Dkt. 30-1 at 4 (Defs. SUMF ¶ 27); (2) "Yazzie used the [o]rganization's credit card to pay her personal rent," *id.* (Defs. SUMF ¶ 28); (3) "Yazzie signed her own expense reports when the [o]rganization's expense reimbursement policy required that the President approve her expenses," *id.* (Defs. SUMF ¶ 29); (4) "[o]n two separate occasions []Yazzie signed a petty cash check to herself for $500 without notice to, or approval by, []Van Pelt," *id.* at 5 (Defs. SUMF ¶ 30); (5) the "audit report found several more duplicate payments to Ms. Yazzie including for cable expenses in the amount of $108.07," *id.* (Defs. SUMF ¶ 31); and (6) the auditor "found that the Senior Accounting Associate had taken an advance of $2,600" that Yazzie wrote off without authority, *id.* (Defs. SUMF ¶¶ 33–36).  Although Yazzie denies any financial wrongdoing, Defendants have offered sufficient evidence to shift the burden back to Yazzie to point to sufficient evidence to permit a reasonable jury to find that the proffered non-discriminatory rationale is pretextual and that the actual reason was discriminatory.

Yazzie, in turn, has satisfied this burden by "casting doubt on the objective validity of the employer's explanation."  *McCarthy*, 825 F.3d at 671 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143–46 (2000)).  To start, she has offered a detailed response to Defendants' allegations of financial misconduct.  She disputes, for example, that she was responsible for being reimbursed twice, explaining that she "was unaware that Employee Emily

Imhoff had also submitted the same request on the Plaintiff's behalf."  Dkt. 33-3 at 4–5 (Pl. Resp. to Defs. Fact 27) (citing Yazzie Decl. ¶ 7).  She disputes that she impermissibly used the NOW credit card to pay personal rent, claiming instead it was "to make a security deposit on an apartment as part of her relocation to Washington D.C.," which "was a moving expense, for which incoming NOW Officers are permitted."  Dkt. 33-3 at 5 (Pl. Resp. to Defs. Fact 28) (citing Yazzie Decl. ¶ 8).  She also disputes that she acted improperly in signing expense reports or signing petty cash checks, explaining that she did so only "when Van Pelt was not present in Washington D.C," Dkt. 33-3 at 5–6 (Pl. Resp. to Defs. Facts 29, 30) (citing Yazzie Decl. ¶ 9). And she disputes that she authorized a $2,600 advance, explaining that the "advance was made during Terry O'Neil's administration and at no time was [she] instructed to do anything related to that advance."  Dkt. 33-1 at 6 (Yazzie Decl. ¶ 11).

To be sure, the fact that an employer is mistaken or unjustly attributes misconduct to an employee does not mean that the employer acted for discriminatory reasons.  Employers are allowed to make mistakes without violating the anti-discrimination laws and, as long as an employer "honestly and reasonably believed" that the employee engaged in misconduct, *Brady*, 520 F.3d at 496, the courts may not act as super-managers, second guessing decisions (even misguided decisions) made for non-discriminatory reasons, *see DeJesus v. WP Co. LLC*, 841 F.3d 527, 534 (D.C. Cir. 2016); *Sagar v. Mnuchin*, 305 F. Supp. 3d 99, 111 (D.D.C. 2018).  But where a substantial dispute exists about whether the conduct occurred, "a reasonable jury might infer . . . [that the employer] was dissembling to cover up a discriminatory motive."  *McCarthy*, 825 F.3d at 672.  As the Supreme Court explained in *Reeves v. Sanderson Plumbing Products*: "[I]t is permissible for the trier of fact to infer the ultimate fact of discrimination from the falsity of the employer's explanation."  530 U.S. 133, 147 (2000) (emphasis omitted).

Here, crediting Yazzie's evidence, a reasonable jury might infer that at least some of the asserted financial misdeeds were trumped up or exaggerated to facilitate Van Pelt's purported goal of removing Yazzie from office.  Yazzie attests, for example, that some of the alleged financial mistakes were made by others, including the prior NOW administration.  Dkt. 33-1 at 6 (Yazzie Decl. ¶ 11).  A reasonable jury might also reject Defendants' refrain that the report from NOW's independent auditors insulates any finding of wrongdoing from Yazzie's accusation that Van Pelt's alleged animus was the moving force behind the adverse actions.  The audit report notes, for example, that the duplicative disbursement was "brought to [the auditor's] attention by the President" of the organization.  Dkt. 30-3 at 131.  Based on this and other evidence, a reasonable jury might infer that Van Pelt pointed the auditors in the direction she favored and that she did so for discriminatory reasons.

Most importantly, Yazzie identifies evidence that would permit a reasonable jury to find that Van Pelt's hostility dates back to the very beginning of their relationship, before any of the asserted financial misdeeds occurred, and that Van Pelt at times used racially pointed (and arguably derogatory) language when dealing with or referring to Yazzie and others.  Yazzie attests, for example, that from the beginning of their relationship, Van Pelt spoke about her in racial terms—creating election materials that referred to Yazzie as "100% Navajo" and introducing Yazzie each time as "100% Navajo" or "Native American."[2]  Dkt. 33-1 at 3–4 (Yazzie Decl. ¶¶ 2–3).  Yazzie also attests, without contradiction, that Van Pelt used the racially offensive term "Redskins" in a press release on May 3, 2018.  Dkt. 33-1 at 9 (Yazzie Decl. ¶ 22); Dkt. 34-3 at 5 (Defs. Resp. to Pl. Facts 14–15).  And as already discussed, Yazzie declares that

---

[2] Defendants object to these statements as hearsay, but they are offered as statements of an opposing party and, in any event, are not offered for the truth of the matter asserted.  Fed. R. Evid. 801(d)(2) & 801(c)(2).

on January 29, 2018, during her altercation with Van Pelt, Van Pelt yelled: "'You won't be here for three years!' 'I am the president, so you have to do what I say!' 'You don't understand' and 'You "P.O.C."[']" Dkt. 33-1 at 7 (Yazzie Decl. ¶ 13).  On Yazzie's telling, "Van Pelt said 'P.O.C' phonetically, in a hostile manner as if it were a slur and a way to indicate that people of color were somehow a different set of individuals." *Id.*  More generally, Yazzie attests that Van Pelt would utter "You P.O.C.'s" "when complaining to [Yazzie] or the staff."  Dkt. 33-1 at 7 (Yazzie Decl. ¶ 14).

Emily Imhoff, who served as the "President's Assistant and later Coordinator of the President's Office" for much of the relevant time, corroborates important aspects of Yazzie's testimony, attesting that she personally "witnessed . . .Van Pelt freeze . . . Yazzie out of the administration: refusing to speak with her, include her in meetings, or include her in important email threads."  Dkt. 33-1 at 39 (Imhoff Decl. ¶¶ 1, 3).  Imhoff further attests that she "witnessed . . . Van Pelt belittle . . . Yazzie . . . and other women of color."  *Id.* (Imhoff Decl. ¶ 4).  Other evidence confirms that a substantial number of Yazzie's job responsibilities were reassigned to Lisa Seigel, who is not Native American.  Dkt. 33-4 at 5 (Pl. SUMF ¶ 16).

Yazzie also points to testimony from Christian Nunes, who succeeded her as Vice President, which includes echoes of the mistreatment that Yazzie maintains that she suffered at the hands of Van Pelt.  Nunes testified, for example, that Van Pelt "always introduced [her] as 'My Black vice president,'" Dkt. 33-2 at 27 (Nunes Dep. at 44); that "Van Pelt said things" about Nunes to National Board members "that were not true;" that Van Pelt falsely accused her of "financial malfeasance;" and that certain financial responsibilities were taken from her based on the recommendation of the auditors, *id.* at 28–29 (Nunes Dep. at 46–47).  And echoing other aspects of Yazzie's claims, Nunes further testified that she was "left out of executive meetings,

excluded from budget discussions, and [that] almost all of her responsibilities [were] reassigned to white women in the organization." *Id.* at 39–40 (Nunes Dep. at 67–68).  In response, Defendants merely assert that Nunes' testimony "is not material to the issues in this case."  Dkt. 34-3 at 7–8 (Defs. Resp. to Pl. Facts 21–27).  That misses the point.  Even though the conduct that Nunes describes occurred after Yazzie was fired, it arguably reflects a pattern of behavior toward women of color and, as such, corroborates Yazzie's account of how *she* was treated by Van Pelt.

Defendants discount the evidence regarding Van Pelt's behavior by arguing that it was the National Board, and not Van Pelt, that took action against Yazzie.  That argument fails for two reasons.  First, it was Van Pelt—and not the National Board—that locked Yazzie out of the national headquarters from May 21, 2018, to June 10, 2018.  Second, and more importantly, Defendants fail to account for the "cat's paw" theory of liability, which posits that "an employer can be liable when a direct supervisor harbors discriminatory animus and influences the ultimate decision maker, even if that decision maker lacks any discriminatory animus."  *Noisette v. Lew*, 211 F. Supp.3d 73, 94 (D.D.C. 2016) (citing *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011)).  Yazzie's evidence shows Van Pelt working in coordination with the Board to remove Yazzie.  For instance, as early as May 2018, Van Pelt, along with at least one Board member (Beth Corbin) and a NOW attorney (Tom Hart), sought Yazzie's resignation.  Dkt. 33-4 at 8 (Pl. SUMF ¶ 35).  In Defendants' view, this evidence is inadmissible because Van Pelt, Corbin, and Hart offered Yazzie a financial settlement if she would agree to resign.  Dkt. 34-3 at 10 (Defs. Resp. to Pl. Fact 35) (citing Fed. R. Evid. 408).  But the key point is not that Yazzie was offered a financial settlement, but rather that Van Pelt was working in coordination with at least one Board member in seeking to oust Yazzie.  That evidence of coordination does not turn on a

statement "furnishing, promising, or offering" a settlement or on any "conduct or a statement made during compromise negotiations about the claim."  Fed. R. Evid. 408.

Significantly, Yazzie also offers other evidence that Van Pelt lobbied Board members to remove Yazzie.  Wapes'a-Mayes, who served on the Board at relevant times, attests that Van Pelt "called [her] and asked [her] to . . . vote to remove . . . Yazzie as vice-president" and "claimed that . . . Yazzie had mismanaged the organization[']s finances and stolen money."  Dkt. 33-1 at 65 (Wapes'a-Mayes Decl. ¶ 3).  That evidence is sufficient to permit a reasonable jury to infer that Van Pelt "influence[d] the ultimate decision maker[s]" and that any "discriminatory animus" that she may have harbored thereby infected the Board's actions.

Defendants also argue that the Court should decline to rely on Yazzie's declaration under the "sham affidavit doctrine."  Dkt. 34 at 9.  Under that doctrine, "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp*., 526 U.S. 795, 806 (1999).  As the D.C. Circuit has observed, "'[t]he objectives of summary judgment would be seriously impaired if the district court were not free to disregard [the later testimony].'"  *Pyramid Secs. Ltd. v. IB Resol., Inc*., 924 F.2d 1114, 1123 (D.C. Cir. 1991) (second alteration in original) (citation omitted); *see also Galvin v. Eli Lilly and Co*., 488 F.3d 1026, 1030 (D.C. Cir. 2007).  At the same time, however, courts must take care not to invade the province of the jury by disregarding affidavits or declarations based on non-dispositive inconsistencies or a witness's better recollection of events after a deposition.  *See Pyramid Secs. Ltd.*, 924 F.2d at 1123 (noting that "[a] deponent may have

been confused about what was being asked or have lacked immediate access to material documents").

Defendants argue that "Plaintiff's recollection of [the January 29, 2018] alleged altercation with . . . Van Pelt . . . has changed dramatically since her deposition." Dkt. 34 at 9. They identify two specific changes—that Yazzie now declares she was in the office of Linda Berg during the alleged January 29, 2018 altercation, not alone, and that Yazzie now declares Van Pelt was "yelling" rather than speaking in a "very stern low voice." *Id.* at 9–10. The rest of the differences that Defendants cite are not, in fact, contradictions but, rather, instances in which the declaration offers greater detail about what was said or instances in which, according to Defendants, other evidence in the record arguably contradicts Yazzie's sworn statements. The Court is unpersuaded that the "sham affidavit doctrine" applies here.

As an initial matter, the Court notes that Defendants did not raise this argument until they filed their reply brief. Although that delay is understandable, as they did not have access to Yazzie's declaration until she filed her opposition brief, it explains why Yazzie did not specifically address the doctrine or attempt to explain any discrepancies between her deposition and her declaration. Even more importantly, although the discrepancies that Defendants emphasize might provide fair grounds for impeachment at trial, they are not central to the question whether Defendants are entitled to summary judgment. At this stage of the proceeding, where the Court is not called upon to make credibility judgments, it makes little difference whether Yazzie was alone with Van Pelt when the encounter occurred or whether Van Pelt "yelled" or merely used a "very stern low voice" when confronting Yazzie. Finally, Defendants' characterization of Yazzie's deposition is not entirely accurate. They assert, for example, that Yazzie testified at deposition that she could not "really speak to what [Van Pelt] said," Dkt. 34 at

10, leaving the impression that the slightly more detailed description of the alleged events as set forth in Yazzie's declaration was fabricated.  But what Yazzie actually said at her deposition was that reliving the relevant events was "very emotional for" her and that she could not "really speak to what [Van Pelt] said *because I need to hold my control*."  Dkt. 30-6 at 3–4 (Yazzie Dep. at 56–57) (emphasis added).

## Removal

Defendants' arguments regarding the Board's decision to terminate Yazzie's employment are on slightly stronger footing, although the Court is, once again, unpersuaded that Defendants are entitled to summary judgment.  Between July 5, 2018, when the National Board changed Yazzie's job responsibilities, and May 6, 2019, when it voted to remove Yazzie from office, the Board put in place the VP Oversight Committee and coaching structures, both of which provided the Board with feedback on Yazzie's job performance.  Dkt. 30-1 at 6–8 (Defs. SUMF ¶¶ 40–62).  According to Defendants, the Board ultimately decided to remove Yazzie from office because it had "major concerns" regarding "Yazzie's lack of communication and unwillingness to follow the guidelines" set by the Oversight Committee, Dkt. 30-2 at 21.  They also maintain that they credited their human resources consultant, Andrea Grayson, who reported that "Yazzie lacked solid organizational skills, did not communicate effectively, and was noncompliant with requests."  *Id.*  This explanation, as supported by the Oversight Committee's report, Dkt. 30-3 at 173–75 (Davis Decl. Ex. 13), and Grayson's report, Dkt. 30-3 at 182–84 (Davis Decl. Ex. 15), readily satisfies Defendants' burden of proffering a "legitimate, nondiscriminatory, clear, and reasonably specific explanation" for taking adverse employment action.  *Figueroa*, 923 F.3d at 1092.

The relevant question, then, is whether Yazzie has carried her burden of proffering sufficient evidence for a reasonable jury to find that the Board's decision was pretextual—or that Van Pelt influenced the Board's ultimate decision—and that the actual reason that Yazzie was removed was because of her race.  This is a close question because Defendants offer substantial evidence of Yazzie's poor performance after the Board created the Oversight Committee.  The Oversight Committee reported, for example, that Yazzie was often late in submitting required reports to the committee, at times failed to submit these reports, was late in responding to emails, and had failed to fully adhere to the "board approved scope of work."  Dkt. 30-3 at 172 (Davis Decl. Ex. 13).  Grayson sounded similar themes.  Shortly before the Board meeting at which Yazzie was removed from office, Grayson reported that Yazzie "does not routinely respond to emails and texts in a timely manner," "does not follow policies and procedures as established by the NOW organization;" "is frequently unable to put her hands on documents" and "does not know how to save documents;" lacks "access to reliable internet[] and equipment such as [a] computer, phone, [and] printer/scanner;" "is not compliant with requests;" is often "out of the office;" "does not communicate effectively;" and "does not appear to accept responsibility . . . for any of her lack of success[]."  Dkt. 30-3 at 182–85 (Davis Decl. Ex. 15).  In short, substantial, uncontroverted evidence paints an unflattering picture of Yazzie's performance and provides ample basis for a jury to find that the Board removed her from office for compelling reasons unrelated to her race.

Other uncontroverted evidence, however, paints a more sympathetic picture of Yazzie's performance.  Defendants do not dispute, for example, that Yazzie was banned from entering NOW's office and directed to work "in the field," that she was "denied resources to conduct her work;" that she was subjected to unique "oversight;" that she was "prohibited from speaking

with NOW staff and members of the Board;" and that her "lack of a budget and administrative support made it" difficult for her "to complete her work." Dkt. 34-3 at 12 (Defs. Resp. to Pl. Fact 44). Many of these obstacles, moreover, are directly responsive to the criticisms raised by the Oversight Committee and human resources consultant. Yazzie was criticized, for example, for her lack of organizational skills or lack of access to necessary technology, but she was denied resources and a budget. She was ordered to operate in the field but criticized for being out of the office and having poor internet connectivity.

It is not the Court's role to decide which of these pictures predominates and which more accurately reflects Yazzie's performance. Nor is it the Court's role to decide (1) whether the Board, in fact, removed Yazzie based on the legitimate (and untainted) belief that her performance was unacceptable or was, instead, influenced by Van Pelt, and (2) whether Van Pelt, in turn, acted for legitimate or discriminatory reasons. The sole question for the Court is whether Yazzie has offered sufficient evidence to permit a reasonable jury to find that she was, in the end, removed from office because of her race. With respect to that narrow question, the Court is persuaded that a reasonable jury could find that Van Pelt was motivated by racial animus and that this started and later reinforced a chain of events that, as Van Pelt allegedly forecast in January 2018, ensured that Yazzie was unable to serve her full term as Vice President. There are, of course, numerous disputed questions of fact and many other interpretations of the relevant events. Sorting those questions out, however, is the province of the jury.

The Court will, accordingly, deny Defendants' motion for summary judgment with respect to Yazzie's section 1981 and Title VII disparate treatment claims.

**C.      Hostile Work Environment Discrimination under Section 1981 and Title VII**

"To prevail on a hostile work environment claim, a plaintiff must first show that he or she was subjected to 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 577–78 (D.C. Cir. 2013) (section 1981) (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (Title VII)).  To qualify, the workplace must be "both objectively and subjectively offensive;" it must be "one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Faragher v. City of Boca Raton*, 524 U.S. 775, 787 (1998).  "To determine whether an environment is sufficiently hostile or abusive," the Court must "'look[ ] at all the circumstances,' including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* at 787–88 (quoting *Harris*, 510 U.S. at 23).

Often, "a few isolated incidents of offensive conduct [will] not amount to actionable harassment." *Stewart v. Evans*, 275 F.3d 1126, 1134 (D.C. Cir. 2002) (holding that a plaintiff could not prove prima facie case of sexual harassment where "claim amount[ed] to only one isolated incident of alleged sexual harassment"); *see also Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001) (no actionable harassment in case involving singular statement); *Harris v. Wackenhut Servs., Inc.*, 419 F. App'x 1, 1 (D.C. Cir. 2011) (holding that "three racially motivated comments directed at [the plaintiff] . . . 'do not amount to actionable harassment'" (citation omitted)).  But, in certain circumstances, even a single, particularly severe incident might suffice.  *See Ayissi-Etoh*, 712 F.3d at 577 (noting a "deeply offensive racial epithet . . . might well have been sufficient to establish a hostile work environment").  "Severity and

pervasiveness are complementary factors and often go hand-in-hand, but a hostile work environment claim could be satisfied with one or the other." *Brooks v. Grundmann*, 748 F.3d 1273, 1276 (D.C. Cir. 2014).

Here, Defendants argue that, even accepting Yazzie's version of events, Van Pelt's conduct was at most "rude and unwelcome" and that any abusive or offensive conduct was neither pervasive nor severe enough to give rise to a hostile work environment.  Dkt. 30-2 at 25. And, they also argue that Yazzie has failed to offer evidence that she was subjected to any such harassment *because of her race*.  Dkt. 30-2 at 31 (citing *Peters v. District of Columbia*, 873 F. Supp. 2d 158, 189 (D.D.C. 2012)).  As Defendants stress, a plaintiff asserting a hostile work environment claim bears the burden of proffering evidence that would permit a reasonable jury to find a "'linkage of correlation' between the allegedly harassing behavior and the claimed ground of discrimination or her participation in protected activity."  *Holmes-Martin v. Sebelius*, 693 F. Supp. 2d 141, 166 (D.D.C. 2010).  Yazzie, in turn, responds that Van Pelt's behavior on January 29, 2018—when she allegedly referred to Yazzie as "You P.O.C.," threatened her job, and physically accosted her—meets this burden.  Dkt. 33 at 21; *see also* Dkt. 33-4 (Pl. SUMF ¶¶ 28–30).

The Court is persuaded that a reasonable jury could find that Van Pelt's hostile behavior toward Van Pelt was based on racial animus.  Although it is not difficult to imagine uses of the acronym "P.O.C." that are not tinged by any hint of racial animus, the same cannot be said of the use of the phrase "*You* P.O.C." in an angry exchange that was peppered with threats of removal, a physical assault, and the throwing of papers.  Nor was this the only occasion in which Van Pelt allegedly used racially offensive language.  Yazzie contends, for example, that Van Pelt "published a press release using and printing the racist term 'Redskins' ignoring the long held

practice among progressive organizations of refusing to use that term in print, at least without identifying it[s] racism."  Dkt. 33-1 at 9 (Yazzie Decl. ¶ 22).  Defendants, in turn, do not dispute that Van Pelt used that term; they do not dispute that it is racially offensive; and they offer no explanation regarding how or why Van Pelt used it.  Dkt. 34-3 at 5 (Defs. Resp. to Pl. Fact 14).  Instead, they argue that Yazzie's declaration "is merely a statement of her belief" and, in any event, the "fact is not material."  *Id.*  Considered as a whole, this evidence is sufficient to permit a reasonable jury to find that Van Pelt was motivated by racial animus.

Although a closer question, the Court is also persuaded that Yazzie has carried her burden of demonstrating that a reasonably jury could find that Van Pelt created a hostile work environment.  For present purposes, the Court need not hold that the phrase "You P.O.C." is among the small handful of slurs that, standing alone, is sufficient to create a hostile work environment.  *Cf. Ayissi-Etoh*, 712 F.3d at 580 (Kavanaugh, J., concurring) (observing that no word other than the n-word "so powerfully or instantly calls to mind our country's long and brutal struggle to overcome racism and discrimination against African–Americans.").  Yazzie alleges more than a single instance of verbal abuse.  She alleges that in the same interaction, Van Pelt "threw papers, grabbed her arm and bumped (body slammed) her."  Dkt. 33-4 (Pl. SUMF ¶ 29).  Nor was that the only incident that Yazzie invokes.  She alleges that Van Pelt refused to meet with her; refused to include her on emails and in meetings; never gave her access to the organizations' financial software and tech platforms; stripped her of duties or convinced others to do so, locked her out of the office; and ostracized her by preventing her from interacting with other NOW employees "both when she was still at the NOW headquarters and when she was ordered to work 'in the field.'"  Dkt. 33 at 23; *see also* Dkt. 33-3 at 3, 4, 8 (Pl. Resp. to Defs. Facts 18, 24, 40); Dkt. 33-1 at 4–5, 7, 9, 11, 12–14, 16 (Yazzie Decl. ¶ 5–6, 12, 20–21, 25–26,

29–33, 39).  Yazzie also presents evidence that Van Pelt viewed Yazzie solely in terms of her racial identity and that she spoke about her in these terms to others.  Dkt. 33-1 at 3–4 (Van Pelt referring to her as "100% Navajo"); *id.* at 46 ("Toni telling Tyler and Rachel that she chose Gilda as her running mate because she needed 'a woman of color.'").

Defendants invoke *Casey v. Mabus*, 878 F. Supp. 2d 175, 184 (D.D.C. 2012), to argue that these allegations are immaterial or insufficient because Yazzie fails to offer evidence of a tangible harm suffered from the exclusion.  Dkt. 34-3 at 4 (Defs. Resp. to Pl. Fact 11).  In *Casey*, the employee alleged that she was "excluded from participating in the planning of training courses and from assisting with or teaching such training courses," but she "failed to allege any specific meetings from which she was excluded and, more importantly, ha[d] failed to articulate any objectively tangible harm she suffered by being excluded."  878 F. Supp. 2d at 184.  Thus, the *Casey* decision concluded the exclusions "were, at best, obnoxious discourtesies and, at worst, manifestations of organizational dysfunction" but either way "far short of the extreme behavior contemplated by the protections of the hostile work environment doctrine."  *Id.* at 189–90.

Here, in contrast, Yazzie offers evidence that, from the very beginning, Van Pelt sought to exclude her from virtually every role typically performed by the Vice President; that she refused to include her in email exchanges or meetings relating to the operation of the organization; and that she denied access to the tools (such as NOW's financial software) that would have allowed her to perform the duties of the Vice President.  When this wholesale exclusion and diminution in status as an elected official is considered alongside the alleged abusive verbal and physical conduct that allegedly occurred on January 29, 2018, the Court is persuaded that Yazzie has offered sufficient evidence to permit a reasonable jury to find that, if

Yazzie is to be believed, Van Pelt's conduct was "sufficiently severe or pervasive to alter the conditions of the victim's employment and [to] create an abusive working environment." *Harris,* 510 U.S. at 21.  This is not to say that Yazzie is entitled to prevail on this claim; only that she has shown enough to present the claim to a jury.

The Court will, accordingly, deny Defendants' motion for summary judgment with respect to Yazzie's section 1981 and Title VII hostile work environment claims.

**D.     Unlawful Retaliation under Section 1981 and Title VII**

Title VII's "antiretaliation provision[] prohibits an employer from 'discriminat[ing] against' an employee or job applicant because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006) (quoting § 2000e–3(a)).  This case implicates the opposition prong of the provision: Yazzie claims she was retaliated against for her complaints of discrimination.  Dkt. 33 at 29–30.  Section 1981 also "encompasses claims of retaliation." *CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008).  For purposes of these claims, Yazzie bears the burden of showing "(1) that [she] engaged in statutorily protected activity; (2) that [she] suffered a materially adverse action by [her] employer; and (3) that a causal link connects the two." *Howard R.L. Cook & Tommy Shaw Found. ex rel. Black Emps. of Libr. of Cong., Inc. v. Billington*, 737 F.3d 767, 772 (D.C. Cir. 2013) ("*Howard*").  As with Yazzie's disparate treatment claim, the Court must consider this claim applying the *McDonnell Douglas*, 411 U.S. at 802, framework, along with the *Brady*, 520 F.3d at 494, shortcut.  *See*, *e.g*., *Carter v. George Washington Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004).

# 1.

"[A]ctivity is 'protected' for the purposes of a retaliation claim 'if it involves opposing alleged discriminatory treatment by the employer or participating in legal efforts against the alleged treatment.'"  *Lemmons v. Georgetown Univ. Hosp.*, 431 F. Supp. 2d 76, 91 (D.D.C. 2006) (quoting *Coleman v. Potomac Elec. Power Co.*, 422 F. Supp. 2d 209, 212–13 (D.D.C. 2006)).  Yazzie argues she engaged in three instances of protected activity: (1) her complaint to the Board and staff after her alleged altercation with Van Pelt on January 29, 2018, (2) the "complaints of discrimination on her behalf by past and present staff members" that were submitted to the Board on June 7, 2018, and (3) her November 13, 2018, complaint to the Oversight Committee and Board regarding NOW's treatment of Brittany Oliver and Sparkle Barrett.  Dkt. 33 at 29–30.

Defendants start off with the bewilderingly assertion that "NOW disputes that Ms. Yazzie engaged in protected activity" before dropping a footnote stating that "[s]olely for purposes of this Motion, Defendants do not dispute that Ms. Yazzie engaged in protected activity for purposes of Title VII."  Dkt. 30-2 at 27 & n.8.  A few pages later, Defendants drop another footnote arguing that Yazzie did not engage in protected activity under Section 1981 because she "complained only about her inability to work with Ms. Van Pelt . . . without mentioning discrimination.'"  *Id.* at 29 & n.11 (quoting *Broderick v. Donaldson*, 437 F.3d 1226, 1232 (D.C. Cir. 2006)).  In their reply, Defendants add an argument that opposition by coworkers does not constitute protected activity.  Dkt. 34 at 20 n.10.  Their reply, however, does not otherwise engage with the merits of whether Yazzie's behavior was protected activity.  The Court agrees that Yazzie's second alleged instance does not support a retaliation claim because it neither claims that Yazzie herself engaged in protected activity nor claims that those who did so were

acting at her behest.  But the first and third alleged instances involve activity in which Yazzie herself objected to discriminatory treatment.

Regarding the first instance, Yazzie offers evidence that her complaints on January 29, 2018, were presented as objections to racial discrimination.  Although one of her emails from that day speaks only generally of Van Pelt's creation of "a hostile workplace," *see* Dkt. 33-1 at 23 (Pl. SUMF Ex. A), her second email, which went to the National Board and to NOW staff, adds: "Of most concern is that she is patronizing to the people of color staff," *id.* at 25 (Pl. SUMF Ex. B).  Regarding the third instance, Yazzie offers evidence that her complaints about NOW's treatment of Oliver and Barrett were also presented as objections to racial discrimination.  Her email objected to how NOW was "[a]llowing these two innocent women of color feminists [to] have their careers undermined or even ruined by being fired under false pretext for racism[.]"  *Id.* at 33 (Pl. SUMF Ex. E).  The Court does not see, and Defendants do not suggest, any reason why the retaliation provisions would not cover Yazzie's activity opposing unlawful discrimination against fellow employees.  *Cf. Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276 (2009).  Taking the facts in the light most favorable to the nonmovant, as it must, the Court is satisfied that Yazzie opposed Van Pelt's discriminatory treatment.

## 2.

An action taken in retaliation is materially adverse for the purpose of a retaliation claim if it "would have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008) (internal quotation marks and citation omitted).  "The Supreme Court has instructed that the universe of cognizable retaliatory actions is broader than that of discriminatory actions, as a reasonable

worker could be discouraged from reporting abuse by actions than might not themselves be considered abusive," while also cautioning that "retaliation actions should not be a means to micromanage supervisor decisions or sanction trivial harms."  *Swann v. Off. of Architect of Capitol*, 73 F. Supp. 3d 20, 26–27 (D.D.C. 2014), *aff'd* 2015 WL 5210251 (D.C. Cir. Aug. 18, 2015).

Yazzie's opposition to Defendants' motion for summary judgment identifies three materially adverse actions that allegedly resulted from her January 29, 2018, complaints to NOW staff and Board: the failed effort to pressure her to resign on May 21, 2018; the successful effort to lock her out of the office from May 21, 2018, to June 10, 2018; and the substantial change in her role that took place on July 5, 2018.  *See* Dkt. 33 at 30.  Yazzie also identifies one materially adverse action that allegedly resulted from her November 13, 2018, oppositional activity: she was removed from a public-facing role at NOW.  *Id.*  Finally, the Complaint identifies Yazzie's discharge as a retaliatory action.  Dkt. 1-3 at 31.

Making substantial changes to an employee's responsibilities has long been widely recognized as a materially adverse action.  *Forkkio v. Powell*, 306 F.3d 1127, 1132 (D.C. Cir. 2002); *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007); *Thomas v. Vilsack*, 718 F. Supp. 2d 106, 122 (D.D.C. 2010) ("A drastic reduction in responsibilities is an 'objectively tangible harm' even where a plaintiff does not suffer a reduction in grade, pay, or benefits." (quoting *Holcomb v. Powell*, 433 F.3d 889, 902 (D.C. Cir. 2006))).  Excluding an employee from meetings that are key to professional advancement has also been recognized as a materially adverse retaliatory act.  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006); *Allen v. Napolitano*, 774 F. Supp. 2d 186, 199–200 (D.D.C. 2011).  In addition, facing direct

pressure to resign certainly might "dissuade[] a reasonable worker from making or supporting a charge of discrimination." *Baloch*, 550 F.3d at 1198.

Defendants' motion for summary judgment does not meaningfully argue that these actions were not materially adverse under the statute. Defendants' primary argument is that the Court cannot consider the evidence that Defendants pressured Yazzie to resign in exchange for a cash settlement because Yazzie has not presented the evidence in a form capable of conversion into admissible evidence. Fed. R. Civ. P. 56(c)(2); *see Gleklen v. Dem. Cong. Campaign Comm.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000). Here, Yazzie's evidence at least arguably comes from the content of settlement talks, which Defendants assert is inadmissible under Fed. R. Evid. 408. *See* Dkt. 34-3 at 10 (Defs. Resp. to Pl. Fact 35). Without resolving the evidentiary question, the Court concludes that there is a sufficient basis to find that the evidence is capable of conversion into evidence that is admissible under Rule 408(b)'s exception for evidence of settlement discussions offered "for another purpose" and not "to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction." Fed. R. Evid. 408. The D.C. Circuit has held that settlement letters may be offered for "another purpose"—that is, other than to prove or disprove the validity of the underlying claim or the amount in dispute—when "such correspondence can be used to establish an independent violation ([such as], retaliation) unrelated to the underlying claim which was the subject of the correspondence (race discrimination)." *Carney v. Am. Univ.*, 151 F.3d 1090, 1095 (D.C. Cir. 1998).

Defendants also address Yazzie's retaliation claims in passing in two footnotes in their reply brief. Dkt. 34 at 20 nn.11 & 12. The footnotes simply state, "*See supra* at 10," referring the reader, without any additional reasoning, back to the section addressing adverse action in the

status-discrimination context.  *Id.*  The footnotes do not advance Defendants' cause.  Not only has the Court already held that the cross-referenced actions suffice for purposes of Yazzie's disparate treatment claims, but, even beyond that, the "universe of cognizable retaliatory actions is broader than that of discriminatory actions."  *Swann*, 73 F. Supp. 3d at 26–27.  The Court, accordingly, concludes that Yazzie has cleared the adverse-action hurdle with respect to her retaliation claims.

### 3.

Instead of focusing on whether Yazzie's activity was protected or Defendants' actions were materially adverse, Defendants direct most of their fire at the causation requirement.  "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action."  *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).  Defendants suggest that the question whether a but-for or motivating-factor standard applies to section 1981 retaliation claims remains unsettled.  Dkt. 30-2 at 28; *see, e.g.*, *Nassar*, 570 U.S. at 354–55 (distinguishing Title VII retaliation from broader bans on status-based discrimination that include prohibitions on retaliation, including section 1981).  But in light of *Nassar*, 570 U.S. at 352, which applied a but-for standard to Title VII retaliation, and *Comcast Corp.*, 140 S. Ct. at 1014, which applied a but-for causation standard to section 1981 discrimination claims without discussing retaliation, it seems safe to assume that a but-for causation standard also governs section 1981 retaliation claims.  The Court need not resolve that question, however, because, in any event, Yazzie has offered enough evidence to show that a reasonable jury could find in her favor even under the more demanding standard.

"To establish th[e causation] element, the employee must proffer evidence from which a reasonable jury could infer the employer's retaliatory intent."  *McGrath v. Clinton*, 666 F.3d

1377, 1383 (D.C. Cir. 2012) (citing *Montgomery v. Chao,* 546 F.3d 703, 706 (D.C. Cir. 2008)).

"[S]uch evidence may be direct, circumstantial, or both . . . ." *Id.* (citing *McGill v. Munoz,* 203

F.3d 843, 845 (D.C. Cir. 2000). Temporal proximity is one way of proving a nexus between the

protected activity and the adverse action, *see Hamilton v. Geithner*, 666 F.3d 1344, 1357 (D.C.

Cir. 2012), although it is not the only way. The Court may also evaluate other circumstantial

evidence of retaliation under the *McDonnell Douglas* burden shifting framework. *See, e.g.*,

*McGrath*, 666 F.3d at 1383.

Defendants first maintain that there is no evidence of causation because the Board,

although aware of Yazzie's complaints against Van Pelt, was unaware that those complaints

were premised on allegations of racial discrimination. The Court has already rejected this

argument. *See supra* at 44. Moreover, there is ample evidence that multiple adverse actions

were taken by Van Pelt directly, including the lockout, the pressure to resign, and Yazzie's

removal from a public role. The cat's paw theory also applies. "Even if the final decision maker

was unaware of Plaintiff's protected activity, to the extent [that Yazzie] can establish that [Van

Pelt] held retaliatory animus and [that Van Pelt] influenced the final decision maker, [Yazzie]

can establish retaliation." *Uzoukwu v. Metro. Wash. Council of Gov'ts*, 27 F. Supp. 3d 62, 72

(D.D.C. 2014) (citing *Hampton v. Vilsack,* 685 F.3d 1096, 1099, 1101–02 (D.C. Cir. 2012)).

Defendants next argue that the Board had a legitimate, non-retaliatory reason to remove

Yazzie, and otherwise act against her, because of the reports of her financial mismanagement,

her failures to follow NOW protocols, and her poor performance. Dkt. 30-2 at 27 (citing *id.* at

21–22). For the reasons the Court has already explained, however, Yazzie has made a sufficient

showing that these rationales are pretextual. *See supra* at 28–32. Considered along with this

other evidence, Yazzie's temporal evidence is sufficient to create a triable issue of fact on the question of causation.

Defendants disagree and argue that because over five months passed between Yazzie's November 2018 complaints and her May 2019 removal, a reasonable jury could not infer that she was removed in retaliation for her November complaints. But that contention ignores the relevant scope of events on which Yazzie premises her retaliation claims. The alleged retaliation, on her telling, started when she was urged to resign and then locked out of the office on May 21, 2018. That was about four months after her January 29, 2018, complaint. The subsequent interval between her November 13, 2018 complaint and her removal from a public-facing role on January 2, 2019, was just under two months. Dkt. 33 at 16. "Although the Supreme Court has cited circuit decisions suggesting that in some instances a three-month period between the protected activity and the adverse employment action may, standing alone, be too lengthy to raise an inference of causation, neither the Supreme Court nor [the D.C. Circuit] has established a bright-line three-month rule." *Hamilton*, 666 F.3d at 1357–58 (citing *Breeden*, 532 U.S. at 273–74); *see also Bryant v. Pepco*, 730 F. Supp. 2d 25, 32 (D.D.C. 2010) ("[W]here four months separated the alleged protected activity and the alleged discrimination, temporal proximity neither demonstrates causality conclusively nor eliminates it conclusively.").

More significantly, courts have found sufficient evidence of causation and have denied summary judgment when plaintiffs have proffered additional evidence of retaliation during a three-to-four-month period leading to a materially adverse action. *See e.g.*, *Burton v. Donovan*, 210 F. Supp. 3d 203, 214 (D.D.C. 2016), *aff'd sub nom. Burton v. Carson*, 2018 WL 1391543 (D.C. Cir. Feb. 21, 2018). Here, Yazzie offers evidence that the lead-up to the retaliatory actions began earlier in the spring of 2018. She declares, for instance, that Van Pelt revoked her access

to NOW's Paychex software shortly after Van Pelt interrupted her conversation with employee Rachel Motley in late March 2018.  Dkt. 33-1 at 9 (Yazzie Decl. ¶ 20).  In addition, Van Pelt reached out to the auditors in April 2018, which, on Yazzie's telling, was part of Van Pelt's effort to create a false narrative of financial mismanagement as a pretext for taking unjustified, adverse actions against her.  Dkt. 30-1 at 4 (Defs. SUMF ¶ 24); Dkt. 30-3 at 131.  Yazzie further declares that Van Pelt promoted Lisa Seigel to Chief of Staff in May 2018 and assigned Seigel duties that should have remained with Yazzie in her role as Vice President.  Dkt. 33-1 at 9 (Yazzie Decl. ¶ 21).  A reasonable jury could infer that these actions were caused by Yazzie's complaint after the January incident.

A reasonable jury could also infer that the causal wheel kept turning, spiraling into greater and greater ramifications.  As the Court has already detailed, there is myriad disputed record evidence that the January incident, including Yazzie's response, set Van Pelt on a course to remove Yazzie—a course that included locking her out of the office, changing her responsibilities, taking away her resources, and putting her under intense supervision in a way that would ultimately lead to her removal.  A reasonable jury could infer that but-for Yazzie's opposition in January 2018, she would not have been pressured to resign, locked out of the office, and had her role substantially altered, which in turn caused her removal.  A reasonable jury could also infer that but-for Yazzie's opposition in November 2018, she would not have been removed from a public-facing role at NOW.  Accordingly, the Court will deny summary judgment on Yazzie's section 1981 and Title VII retaliation claims.

## E.   Defamation

Yazzie's Complaint alleges that Van Pelt, Drabek, and Corbin defamed her by falsely accusing her of embezzlement and illegal credit card use.  According to Yazzie, these were

accusations of criminal behavior that were known to be false, intended to harm her, and resulted in professional and personal injury.  Dkt. 1-3 at 35–36 (Compl. at ¶¶ 131–36).  Yazzie names NOW as a defendant on this claim because she alleges it knew of and ratified the conduct.  *Id.* at 36 (Compl. ¶ 133).

Yazzie does not respond to Defendants' motion for summary judgment with respect to her defamation claim.  When a nonmovant fails to respond to a motion for summary judgment, the Court must nevertheless "determine for itself that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law."  *Winston & Strawn, LLP v. McLean*, 843 F.3d 503, 509 (D.C. Cir. 2016).  The Court has the discretion to accept as conceded any uncontroverted facts that the moving party supports with competent evidence.  *See* Fed. R. Civ. P. 56(e)(2).  Under those circumstances, there is no genuine dispute for the court to adjudicate, and the court may grant summary judgment in favor of the movant based on those undisputed facts.  *See Dutton v. U.S. Dep't of Justice*, 302 F. Supp. 3d 109, 126 n.6 (D.D.C. 2018); *cf. Durant v. D.C. Gov't*, 875 F.3d 685, 695 (D.C. Cir. 2017) (citing *Durant v. District of Columbia*, 932 F. Supp. 2d 53, 64 & n.14 (D.D.C. 2013))).  Defendants seek to distinguish *Winston & Strawn*, 843 F.3d at 509, by arguing that arguments raised in a motion for summary judgment should be treated as conceded if not responded to by an otherwise responsive opposition brief.  Dkt. 34 at 24–25 & n.17.  The Court declines to wade into that question here because, as Defendants acknowledge, the decision whether to treat any such argument as conceded is, at a minimum, within the discretion of the district judge.  *See id.* at 25 ("courts *may* deem a claim abandoned") (emphasis added); *see also* Local Civ. R. 7(b) ("*may* treat the motion as conceded") (emphasis added).  Here, the parties' submissions have already required the Court to delve into the record on topics that involve many of the same facts.

To establish a claim for defamation under D.C. law, a plaintiff must prove "'four elements: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.'" *Deripaska v. Associated Press*, 282 F. Supp. 3d 133, 140–41 (D.D.C. 2017) (quoting *Solers, Inc. v. Doe*, 977 A.2d 941, 948 (D.C. 2009)). Beyond simply positing that the Court should treat the defamation claims as conceded on the merits, Defendants argue, first, that there is no evidence that the statements at issue were untrue and, second, that they were published only to individuals within the coverage of the "common interest" privilege. Dkt. 30-2 at 32–33. For many of the reasons already discussed, the Court declines to resolve Defendants' first defense—that the statements were true—at this stage of the proceeding; there remains a genuine dispute of material fact as to whether Yazzie committed embezzlement and/or credit card fraud and whether she engaged in financial mismanagement. *See supra* at 28–32.

With respect to their second defense, Defendants invoke the "common interest" privilege, which "protects otherwise defamatory statements made '(1) . . . in good faith, (2) on a subject in which the party communicating has an interest, or in reference to which he has, or honestly believes he has, a duty to a person having a corresponding interest or duty, (3) to a person who has such a corresponding interest.'" *Wright v. Eugene & Agnes E. Meyer Found.*, 68 F.4th 612, 624 (D.C. Cir. 2023) (citation omitted). Here, there is no evidence that any defendant told anyone who was not a member of the National Board that Yazzie had embezzled funds or had otherwise engaged in financial misconduct. Dkt. 30-1 at 9 (Defs. SUMF ¶¶ 64–66); Dkt. 30-2 at 33 n.16. Defendants argue that because all National Board members have a common interest in

NOW's financial matters, the statements are protected by the privilege.  Dkt. 30-2 at 33.  But, even granting that there is a common interest, Defendants have failed to demonstrate that no reasonable jury could find that they acted in bad faith.  To the contrary, the underlying pillar of Yazzie's entire case is that Van Pelt acted out of malicious racial discrimination and/or retaliatory animus in her treatment of Yazzie.

The Court will, however, grant summary judgment to Defendants Corbin and Drabek on the defamation claim on the ground that there is no evidence in the record that would permit a reasonable jury to find that Corbin or Drabek's statements were made in bad faith and thus unprotected by the privilege.  But the Court will deny summary judgment to Van Pelt on the grounds that there are many disputed facts in the record that would permit a reasonable jury to find that she defamed Yazzie to Board members in bad faith.  *See, e.g.*, Dkt. 33-3 at 4–7 (Pl. Resp. to Defs. SUMF); Dkt. 33-4 at 8–10 (Pl. SUMF); Dkt. 33-1 at 65 (Wapes'a-Mayes Decl.); *cf. Wright*, 68 F.4th at 624–25 (complaint plausibly alleged statements were made with malice where speaker did not have reasonable grounds for believing statements were true and where racial animus allegedly motivated statements).

Finally, because the Court will permit the defamation claim against Van Pelt to proceed, the Court will refrain from dismissing the defamation claim against NOW.  Neither party has briefed the question whether NOW might bear vicarious liability for Van Pelt's alleged statements.  *Cf. Bethel v. Rodriguez*, 2023 WL 6388851, at *16 (D.D.C. Sept. 30, 2023).  Without briefing on that question, the Court will leave it for another day.

**CONCLUSION**

For the foregoing reasons, the Court hereby **DENIES** Defendants' Motion for Summary Judgment as to Counts I–VI and **GRANTS** the motion in part and **DENIES** it in part as to Count IX.

**SO ORDERED.**

<u>/s/ Randolph D. Moss</u>
RANDOLPH D. MOSS
United States District Judge

Date:  January 22, 2024